Michael A. Tompkins, Esq.*
**Leeds Brown Law, P.C.**
One Old Country Road, Suite 347
Carle Place, NY 11514
Telephone: (516) 873-9550
mtompkins@leedsbrownlaw.com
*Admitted Pro Hac Vice*

*Co-Counsel for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DUY NGUYEN, individually on behalf of himself and other individuals similarly situated,

Plaintiff,

vs.

STEPHENS INSTITUTE, d/b/a
ACADEMY OF ART UNIVERSITY,

Defendant.

Case No. 20-cv-04195-JSW

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff hereby provides this notice of supplemental authority of one recent decision in a similar COVID-19 tuition and fee refund action, *In Re Pepperdine University Tuition and Fees Covid-19 Refund Litigation,* Case No. 2:20-cv-04928 (C.D. Cal. Sept. 26, 2023) (Dkt. 115) a copy of which is attached hereto.

Plaintiff respectfully submits that this decision further supports his position in this matter in support of Plaintiff's Motion for Class Certification (Dkt. 59) and Article III Standing in response to the Order to Show Cause (Dkt. 66).

Dated: Executed this 26th Day of Sept. 2023.

     Carle Place, New York

**LEEDS BROWN LAW, P.C.**
Michael A. Tompkins, Esq. (admitted Pro Hac Vice)
One Old Country Road, Suite 347
Carle Place, NY 11514
Telephone: (516) 873-9550
mtompkins@leedsbrownlaw.com

*Counsel for Plaintiff and the Putative Class*

# Decision

*In Re Pepperdine University Tuition and Fees Covid-19 Refund Litigation*, Case No. 2:20-cv-04928 (C.D. Cal. Sept. 26, 2023) (Dkt. 115)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

IN RE PEPPERDINE UNIVERSITY
TUITION AND FEES COVID-19
REFUND LITIGATION

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 20-4928-DMG (KSx)

**ORDER RE PLAINTIFFS' MOTION
TO CERTIFY A CLASS [96] AND
DEFENDANT'S MOTION TO
EXCLUDE TESTIMONY OF DR. HAL
SINGER [98 (PUBLIC), 104 (SEALED)]**

Before the Court are (1) Plaintiffs' Motion to Certify a Class [Doc. # 96] and (2) Defendant's Motion to Exclude the Expert Testimony of Dr. Hal Singer [Doc. ## 98 (public), 104 (sealed)]. Both motions are fully briefed [Doc. ## 101, 109–113]. The Court held a hearing on the motions on September 15, 2023. Having carefully considered the parties' written submissions and oral arguments, the Court issues the following ruling.

# I.

## PROCEDURAL BACKGROUND

Plaintiff Joseph Pinzon filed this action against Defendant Pepperdine University on June 3, 2020. [Doc. # 1.] In its August 5, 2021 Order ruling on Pepperdine's Motion to Strike and Motion to Dismiss, the Court also ordered Pinzon's case to be consolidated with Plaintiff Mathew Rezvani's case, as well as any later-filed tuition refund actions against Pepperdine. [Doc. # 63.] Plaintiffs Pinzon and Rezvani filed their Consolidated Class Action Complaint on September 16, 2021. [Doc. # 66.] On January 6, 2023, Pepperdine filed a Motion for Summary Judgment. [Doc. # 79.] The Court held a hearing and then granted in part and denied in part Pepperdine's Motion for Summary Judgment. [Doc. # 92.] Plaintiffs' remaining claims are for (1) restitution based on quasi-contract and (2) violation of California's Unfair Competition Law ("UCL") under the "unfair" prong.

Plaintiffs now seek to certify the following Class:

**All students who paid or were obligated to pay tuition, fees, or other costs to Pepperdine University for the Spring 2020 academic term.**

*See* Mot. For Class Certification at 2.[1] Plaintiffs seek to exclude all students who enrolled in Pepperdine education programs that, prior to March 16, 2020, were

---

[1] Page citations herein refer to the page number inserted by the CM/ECF system.

-2-

offered exclusively online.[2] Plaintiffs also seek an order (a) appointing Plaintiffs as Class Representatives, and (b) Interim Co-Lead Counsel[3] as Class Counsel.

Because Pepperdine's motion to exclude evidence bears on the Court's resolution of Plaintiffs' motion to certify a class, the Court will address the *Daubert* motion first.

## II.

## RELEVANT FACTUAL BACKGROUND

The Court described the factual background of this case in its Motion to Dismiss Order and Motion for Summary Judgment Order and incorporates its prior descriptions herein. *See* Order re Defendant's Motion to Dismiss at 1-3 [Doc. # 63 ("MTD Order")]; Order re Defendant's Motion for Summary Judgment at 2-6 [Doc. # 92 ("MSJ Order")]. The Court summarizes the report of Plaintiffs' expert witness, Dr. Hal Singer, below.

### A.        Report of Dr. Hal Singer

Plaintiffs' expert witness, Dr. Hal Singer, holds a Ph.D. in economics from Johns Hopkins University and currently serves as a Managing Director at Econ One Research, as a professor at the University of Utah, and as the Executive Director of the Utah Project on Antitrust and Consumer Protection. *See* Singer Report ¶ 13 [Doc. # 97-4]; *see also id.* at Appendix 1 (*curriculum vitae*). Here, Dr. Singer created a report attempting to assess the difference in value between an "On-campus Experience" at Pepperdine—*i.e.*, "a university education provided through in-person classes and accompanied by access to a university campus, where students participate in on-campus experiences and use physical campus

---

[2] Plaintiffs also seek to exclude Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other people or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judges assigned to this action, and any member of a judge's immediate family. *Id.*

[3] The Court previously appointed Hagens Berman Sobol Shapiro LLC and Shegerian and Associates, Inc. as Interim Co-Lead Counsel. *See* Order Appointing Interim Class Counsel [Doc. # 65.]

facilities and resources in person," *see* Singer Report ¶ 6—and an "Online Experience" at Pepperdine—*i.e.*, "a university education provided exclusively through online classes, videoconferencing, an online learning management system, and . . . not accompanied by access to in-person campus events, resources, or the use of physical campus facilities." *Id*. He designed and conducted a Choice-Based Conjoint ("CBC") analysis to determine the fair market value of each. Based on his analysis, Dr. Singer concluded that an Online Experience has a fair market value that is 35.1% less than an On-Campus Experience for undergraduates, and 5.5% less for graduate students. *Id*. at ¶ 7. Subtracting the fair market value of the Online Experience from the amount actually paid (allegedly for the On-Campus Experience), he calculates total damages to the class of $7.87 million. *Id*.

Dr. Singer explains that CBC analysis is commonly used by economists to isolate the value of individual product features. Singer Report ¶¶ 8, 18–22. Other scholars have used CBC analysis specifically in the context of assessment of college students' willingness to pay for online learning. *Id*. at ¶ 23 n.34. In his analysis, Dr. Singer considered factors similar to those included in the academic papers he discusses that seek to evaluate similar questions. *See id*. at ¶ 27.

Dr. Singer's survey contained three "modules": the "screener" module, the "attributes" module, and the "conjoint" module. *Id*. at ¶ 29. The screener module filtered survey respondents to identify respondents similar to potential Pepperdine graduate or undergraduate students. *Id*. at ¶¶ 29–34. The attributes module informed the qualified respondents that the survey concerned Pepperdine and described the "product"—the "Semester Package"—and the "attributes" of the programs they would be asked to choose between. *Id*. at ¶ 35. There were five attributes in total: (1) class modality (on-campus or online), (2) campus facilities access (with or without access), (3) tutoring services (decoy), (4) career services and events (decoy), and (5) semester price (between 50-150% of the

base price[4]).  *Id.* at ¶¶ 36–38.  The conjoint module asked respondents to select between semester packages comprised of randomized combinations of attributes.[5]  *Id.* at ¶ 48.  Semester packages were presented in groups of three—"choice sets"—and each respondent was asked to select from the choice set the semester package that they would purchase if those were the only options available.  *Id.*  In addition to the three packages, each choice set also included a "no buy" option.  *Id.*  Ultimately, Dr. Singer's survey yielded a final sample of 518 undergraduate respondents and 507 graduate respondents.  *Id.* at ¶ 50.

Once he received the survey results, Dr. Singer analyzed them to assign a dollar value to each attribute for each respondent.  *Id.* at ¶ 57.  His analysis, at a broad level, shows that undergraduate and graduate students are "highly sensitive" to the Class Modality and Campus Facilities Access attributes.  *Id.*

Finally, Dr. Singer concludes that the shift in the fair market value is exactly equal to the tuition discount required to make students whole because he assumes—pursuant to what he describes as the "traditional CBC approach"—that the supply curve is fixed.  *Id.* at ¶ 68.  After determining the fair market value of an Online Experience, Dr. Singer calculates class damages by comparing the decline in value experienced by Proposed Class Members with the net tuition and fees actually paid by Proposed Class Members.  *Id.* at ¶¶ 69, 71.  Dr. Singer explains that he assumes the supply curve is fixed because Pepperdine, after allegedly committing to in-person instruction, "cannot rewind the clock and attempt to renegotiate that promise in a but-for world with only a smaller subset of Plaintiffs after realizing the lower net Tuition and Fee price it would need to offer to make them purchase its Online Experience voluntarily."  *Id.* at ¶ 75.  Dr. Singer explains that it would be unlikely that Pepperdine would reduce enrollment in response to any potential reduction in students'

---

[4] The "base price" was Pepperdine's actual tuition cost.  *Id.* at ¶ 44.

[5] Dr. Singer's survey asked respondents to select a semester package from different choice sets ten times.  *Id.* at ¶ 48.

willingness to pay the existing tuition. *Id.* at ¶ 83. Dr. Singer states that this is because the incentive structures of university tuition pricing exist outside normal market forces: universities often seek to maximize "alumnus success" by enrolling a relatively high number of prestige-enhancing students, rather than solely seeking to maximize tuition. *Id.* at ¶¶ 78–80. In addition, Pepperdine likely faced fixed costs and made enrollment decisions on a longer-term basis than the single semester at issue here. *Id.*

### III.

### MOTION TO EXCLUDE TESTIMONY OF DR. HAL SINGER

Pepperdine moves to exclude the testimony of Plaintiffs' expert, Dr. Hal Singer, pursuant to Federal Rule of Evidence Rule 702. [Doc. ## 98 (motion), 109 (opposition), 111 (reply)].

### A. Legal Standard

Parties can raise *Daubert* motions at the class certification stage. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.7 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc., On Behalf of Itself & All Others Similarly Situated*, 143 S. Ct. 424 (2022). Under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny, a court must

> assess [an expert's] reasoning or methodology . . . . Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof. . . . Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013) (internal quotations and citations omitted).

In evaluating expert testimony, the trial court should screen out "unreliable nonsense opinions," but judges are not meant to "exclude opinions merely because they are

impeachable." *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Alaska Rent-A-Car*, 738 F.3d at 969).

**B.  Discussion**

Under Federal Rule of Evidence 702, a qualified expert witness may offer opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Pepperdine does not challenge Dr. Singer's qualifications, only his opinions, and the Court finds that Dr. Singer is qualified to render an expert opinion.

**1.  Choice-Based Conjoint ("CBC") Analysis**

Pepperdine argues that a conjoint analysis like Dr. Singer's, while appropriate in other contexts, "is not suitable for valuing higher education, which requires many nuanced and individualized preferences and input from multiple stakeholders."  Mot. to Exclude Dr. Singer at 3.  The Court is not persuaded by this argument.  Dr. Singer cites to other economists' use of conjoint surveys to measure the value of different modalities of higher education.  *See* Singer Report ¶¶ 18–22; *see also id*. at 23 n.34.  And Plaintiffs provide additional authority for this method in their Opposition.  *See Daubert* Opp. at 15–16 n.8 (citing multiple publications in the U.S. Department of Education's Institute of Education Sciences' publication database that used conjoint analyses in the higher education context). The Court therefore concludes that a conjoint analysis is a reasonable method for measuring value in the higher education context.  The fact that Dr. Singer himself had not previously used conjoint surveys for evaluating the value of certain attributes of an education also does not warrant exclusion.  *See, e.g.*, *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017) (noting that prior publication is one indicator that expert testimony is based on valid scientific principles, but concluding that "the district

court was wrong to put so much weight on the fact that the experts' opinions were not developed independently of litigation and had not been published").

### a. Dr. Wilner's Report

In its *Daubert* Motion, Pepperdine asserts that, if Dr. Singer's opinion is admitted, then Pepperdine will offer the rebuttal opinion of its own expert, Dr. Wilner. Mot. to Exclude Dr. Singer at 3. In Dr. Wilner's report, he attacks Dr. Singer's use of a CBC analysis in the context of this case. *See* Shen Decl. Ex. B at 5 [Doc. # 98-3 ("Wilner Report")]. Dr. Wilner also provides many specific critiques of Dr. Singer's report, upon which Pepperdine relies throughout its Motion to Exclude. The Court will reference Dr. Wilner's report *infra* to the extent that it is relevant to the Court's analysis of the pending motions. Ultimately, however, disagreement among experts is common and therefore Dr. Wilner's disagreement with Dr. Singer does not automatically make Dr. Singer's opinion inadmissible. *See City of Pomona*, 750 F.3d at 1049 ("Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable.") (citation omitted).

### 2. Relevance and Reliability of Dr. Singer's Survey

Pepperdine also makes specific arguments as to why Dr. Singer's survey is irrelevant and unreliable under Rule 702.

### a. Restitution under California Law

One of the reasons for which Pepperdine asserts that Dr. Singer's survey is irrelevant and unreliable is because he allegedly did not analyze restitution under California law. Mot. to Exclude Dr. Singer at 5–6. Defendant argues that Dr. Singer failed to analyze restitution under California law because he did not consider supply-side factors in finding the "fair market value" of the difference between an online-only and an in-person Pepperdine education, and because he did not measure restitution arising from impossibility of performance or from any culpability on the part of Pepperdine. Mot. to Exclude Dr. Singer at 5–6; Mot. to Exclude Dr. Singer Reply at 15–17.

Regarding Pepperdine's concerns about Dr. Singer's exclusion of supply-side factors, Pepperdine is correct that many courts have previously excluded conjoint analyses that consider only a consumer's willingness to pay and not the market value of a product. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd on other grounds sub nom. Schell v. Volkswagen AG*, No. 20-17480, 2022 WL 187841 (9th Cir. Jan. 20, 2022) (excluding plaintiffs' conjoint analysis because simply assuming that defendants would have sold cars at the exact same price made the analysis unreliable); *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) (expert's damages model was unreliable because it failed to consider the defendant's willingness to sell a prescription drug for the lower price proposed by the expert); *but see MacDougall v. Am. Honda Motor Co.*, No. 20-56060, 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021) (unpublished) (reversing exclusion of expert witness under *Daubert* because the absence of market considerations went "to the weight given the survey, not its admissibility"). Other courts have required that plaintiffs account for supply-side considerations so they can prove a reasonable value for the product that they actually received, and courts thus can measure the difference between the price paid and the value received. Here, however, Dr. Singer has a plausible reason for declining to consider supply-side factors in his analysis. First, university educations are not like typical "products" purchased by consumers in the everyday marketplace and tuition-setting is not like the pricing of an average product. *See* Singer Report at ¶¶ 77, 78. It is therefore reasonable to think that the measure of restitution in a case of this nature may not look exactly like the measure of restitution in cases concerning more "typical" products. *See In re Tobacco Cases II*, 240 Cal. App. 4th 779, 792 (2015) (noting that there are multiple potential ways to measure restitution).

The parties agree that the measure of restitution should be the difference between the price paid and the value of the services received. The parties disagree, however, whether the "fair value" or "reasonable value" means the fair *market* value (Defendant's

position), or the fair value *to the plaintiff* (Plaintiffs' position).  Defendant may argue to a jury that its definition of fair market value is the correct one, but that possibility is not a basis to prevent Plaintiffs from attempting to prove fair market value on a different basis.

As for Pepperdine's concerns that Dr. Singer did not measure restitution arising from either impossibility of performance or any culpability on the part of Pepperdine, the Court likewise does not see these issues as adequate bases for exclusion.  Pepperdine essentially argues that Dr. Singer's measure of restitution, if not irrelevant before, became irrelevant to this case after the Court granted summary judgment in favor of Defendant on Plaintiffs' express contract claim.  Mot. to Exclude Dr. Singer Reply at 15–17.  The Court disagrees. Pepperdine is correct that, following the Court's MSJ Order, Dr. Singer did not rework his report to explicitly consider the potential impact of impossibility and culpability on his measure of restitution, as he created his report prior to the Court's MSJ Order.  This, however, does not make his opinion inadmissible.  First, even if Dr. Singer had updated his report following the Court's MSJ Order, he would not have needed to consider the impact of impossibility because Plaintiffs' only remaining contract claim is one for quasi-contract.  The pursuance of restitution on a quasi-contract theory necessarily assumes that the performance of an otherwise valid contract has been rendered impossible.  *See Arredondo v. Univ. of La Verne*, 618 F. Supp. 3d 937, 948 (C.D. Cal. 2022).  Consideration of "impossibility" therefore would not have affected Dr. Singer's analysis.  Second, whether Dr. Singer analyzed the impact of culpability on his measure of restitution does not make his opinion inadmissible—if anything, it goes to the weight of the survey.  *See MacDougall*, 2021 WL 6101256, at *1 (reversing exclusion of expert witness under *Daubert* because the absence of market considerations went "to the weight given the survey, not its admissibility").

### b.   Online offerings pre-COVID

Pepperdine criticizes Dr. Singer for failing to consider how Pepperdine's pre-COVID online offerings, which charged the same tuition and fees as the in-person

-10-

programs, impacted the value of remote education. Pepperdine asserts that this is a critical flaw in the report because the fact that online and in-person programs cost the same amount of money pre-COVID shows that both Pepperdine and its actual students valued remote and in-person programs the same. Mot. to Exclude Dr. Singer at 8. The factfinder may ultimately find this real-world evidence of the value of an online-only Pepperdine education more persuasive than Dr. Singer's analysis. But this contrary evidence is not a basis to exclude Dr. Singer's opinions.

### c. Impact of COVID on the value of online instruction

Pepperdine next argues that Dr. Singer's opinion should be excluded because his survey improperly ignores COVID, the "root cause for the shift to online instruction." Mot. to Exclude Dr. Singer at 9. The Court disagrees that Dr. Singer's decision to ignore COVID renders his opinion inadmissible. Although it may be true that students would be willing to pay more for an online education during COVID than they would for an online education during normal circumstances, "the focus is on the value of the service at the time of purchase." *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015). Here, when Pepperdine students first paid their Spring 2020 tuition and fees, no one was yet aware of the myriad ways in which the COVID pandemic would change everyone's lives. Therefore, while the danger of exposure to COVID-19 might be a factor that a factfinder considers important in evaluating the merits of this case, Dr. Singer did not err by not controlling for COVID risk in determining the fair market value of a Pepperdine education.

### d. Aggregated Damages

Pepperdine claims that Dr. Singer "improperly collapsed" Plaintiffs' claims for tuition and fees into a single damages measure. The Court finds this to be an inaccurate characterization of Dr. Singer's report. It is true that Dr. Singer presented a single number representing the net price of a Pepperdine education, but Dr. Singer nonetheless *did* break down tuition and fees in his report. *See, e.g.,* Singer Report ¶¶ 44-45, 45 n.69.

-11-

Pepperdine correctly points out that not all of its students pay the same fees—for example, all Seaver College graduate students pay a mandatory "Scholarly Development Fee" of $120 per year, while Pepperdine's Public Policy graduate students do not pay any yearly mandatory fees. *See id.* at ¶ 45 n.69. To account for these differences, Dr. Singer took the average cost of fees across all of Pepperdine's programs and used that number as the fee amount included in the survey's "base semester price."[6] *See id.* This is a permissible use of "representative evidence." *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016) (allowing the use of an average "donning and doffing" time to prove a class-wide claim for overtime pay even though it actually took different employees different amounts of time to put on protective gear). Further, Plaintiffs' theory does not distinguish between tuition and fees or classes and access to campus, as Dr. Singer's report just seeks to establish the overall difference in value between an In-Person and an Online Experience. The Court therefore does not find Dr. Singer's establishment of damages in the aggregate to be an appropriate reason to exclude his opinion.

### e. Survey Design

Lastly, Pepperdine takes issue with several alleged deficiencies of Dr. Singer's survey design: (1) failure to properly consider the impact of financial aid, (2) failure to model the value of a partial semester transition, (3) lack of information about the Spring 2020 semester, (4) an insufficient pretest, (5) a survey population not reflective of Pepperdine's student population, and (6) an arbitrary selection of attributes.

### i. Impact of Financial Aid

Dr. Singer asked survey respondents who currently or previously received financial aid to "please assume the same amount of financial aid would be made available to you when making your selection in this survey." Singer Report, Appendix 4 at 92; Singer

---

[6] The undergraduate "base semester price" did not require any averaging, because all undergraduate students pay the same "Campus Life Fee" of $252 per year. *See* Singer Report ¶ 45 n.69.

Report, Appendix 5 at 102.  Defendant asserts that this is not enough, and that Dr. Singer should have, among other things, defined what "university-provided financial aid or scholarships" meant and asked respondents to report the amount of financial aid that they actually received.  Mot. to Exclude Dr. Singer at 20.  Pepperdine's critiques could potentially convince a factfinder at trial that Dr. Singer's opinion deserves less weight, but they do not render his opinion inadmissible.

### ii.  Mid-semester Transition

Dr. Singer's survey only asked about full semesters in-person or online and did not consider the mid-semester shift from in-person to online education that occurred in Spring 2020.  Pepperdine contends that this renders Dr. Singer's analysis "not relevant to the actual circumstances at issue." *Id.* at 13.  Pepperdine also takes issue with Dr. Singer's decision to pro-rate the semester package price in the survey.  Pepperdine does not provide, however, an alternative method of calculation that would be more acceptable in the University's eyes.  Again, these aspects of the survey design could potentially be a basis for cross-examination at trial, but the Court is not persuaded that they warrant exclusion under *Daubert*.

### iii.  Information about the Spring 2020 Semester

Dr. Singer's survey used present day rankings and descriptions of Pepperdine, but it used Pepperdine's language and marketing materials from Fall 2020, and the prices included in the survey were from Spring 2020.  Singer Report ¶ 35.  Pepperdine argues that this "mishmash" of timeframes undermines the relevance and reliability of the survey.  Mot. to Exclude Dr. Singer at 10.  Again, if the factfinders at trial conclude that the survey's use of data from multiple timeframes makes the survey results deserving of less weight, they would be entitled to make that decision—but the amount of information Dr. Singer provided about Spring 2020 is not a basis for excluding his testimony.

-13-

#### iv. Pre-test

Pepperdine argues that Dr. Singer failed to properly implement a full pre-test and that this deficiency should serve as a basis for excluding his testimony. Pepperdine asserts that Dr. Singer relied on the fact that he had used "substantially the same survey" in other COVID tuition refund cases to validate his Pepperdine survey. This is not the case. While it is true that very similar versions of Dr. Singer's survey have been used in other COVID tuition refund cases, Dr. Singer performed a pre-test specifically for the Pepperdine survey. Singer Report ¶ 51.[7] This argument, therefore, does not undermine the admissibility of Dr. Singer's opinion.

#### v. Survey Population

Pepperdine contends that Dr. Singer's survey respondents are not representative of the putative class members because he: (1) limited the pool of respondents to those who expressed a preference for in-person instruction, (2) did not inform respondents of Pepperdine's "religious mission," (3) did not compare the demographics of respondents to the demographics of putative class members, and (4) did not ask respondents which universities they either actually or intended to attend. For example, Pepperdine argues that Dr. Singer should have surveyed actual Pepperdine students. Mot. to Exclude Dr. Singer at 4. Concerns about how representative a survey population is do not preclude the survey's admission—instead, they go to the appropriate weight to be assigned to the survey results. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015); *see also Gunaratna v. Dennis Gross Cosmetology LLC*, No. 20-2311, 2023 WL 2628620 at *15 (C.D. Cal. March 15, 2023) (rejecting argument that the consumer demographic of an expert's survey was not representative because it "did not test real purchasers").

---

[7] It appears that there are two paragraph 50s in the Singer Report. Paragraph 51 is between the two paragraph 50s.

### vi. Choice of Attributes

Pepperdine provides several critiques of Dr. Singer's selected attributes, including that he unilaterally chose the attributes, arbitrarily chose Tutoring Services and Career Services as decoy attributes, and offered the Campus Facilities Access attribute as an all-or-nothing option. In response, Plaintiffs reiterate that Dr. Singer: carefully crafted the two key attributes, needed the "price" attribute to convert the survey results into dollars, and analyzed the decoy attributes independently of the two key attributes. Dr. Singer also asserted that he presented the Campus Facilities Access attribute as a binary option to represent the complete lack of physical access to campus that students faced during Spring 2020. Pepperdine's critiques are certainly an appropriate basis for which to attack Dr. Singer's analysis on cross-examination, but they are not enough to warrant outright exclusion of his opinion under Rule 702.

### C. Conclusion

In light of the above discussion, Pepperdine's motion to exclude Dr. Singer's testimony is **DENIED**.

### IV.

### MOTION FOR CLASS CERTIFICATION

### A. Legal Standard

Federal Rule of Civil Procedure 23 provides the standard for certification of a class action. Plaintiffs must meet all of the requirements under Rule 23(a) and must also satisfy at least one of Rule 23(b)'s requirements. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Courts refer to the Rule 23(a) requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation." *See Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). If the four prerequisites of Rule 23(a) are satisfied, a court must also find that the plaintiffs can "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast*

-15-

*Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  At issue here is whether Plaintiffs can prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a pleading standard, and it requires the party seeking class certification to "affirmatively demonstrate his compliance with the Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation omitted).  Thus, a court must conduct a "rigorous" class certification analysis.  *Id.* at 350-51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).  Frequently the analysis "will entail some overlap with the merits of the plaintiff's underlying claim," and "sometimes it may be necessary for the court to probe behind the pleadings . . . ."  *Id.* at 351 (internal quotation omitted).  The Supreme Court cautions, however, that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  A plaintiff seeking certification of a class must prove by a preponderance of the evidence that the prerequisites of Rule 23 are satisfied.  *Olean*, 31 F.4th at 665.

Here, the Court will address numerosity, then commonality and predominance together, and then will turn to typicality, adequacy, and superiority.

**B.    Discussion**

**1.    Numerosity**

The proposed class contains more than 7,000 class members.  *See* Class Cert. Motion, Exhibit 3 [Doc # 97-5].  There is no dispute that numerosity is satisfied.

**2.    Commonality and Predominance**

Because the commonality and predominance factors go hand in hand, the Court will consider them together.  The commonality requirement is satisfied if "there are questions

of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tele. of S.W. v. Falcon*, 457 U.S. 147, 157(1982)). In determining whether a common question of law exists, it is insufficient to find that all putative class members have suffered a violation of the same provision of law. *See id.* at 350. Rather, the putative class members' claims "must depend upon a common contention" that is "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *See id.*

Once Plaintiffs have established that common questions exist, they must show that those common questions will predominate over individualized issues. The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods*, 577 U.S. at 453 (internal citations and quotations omitted). This requires "careful scrutiny" of "whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues." *Id.* (internal citations and quotations omitted). If "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *See Olean*, 31 F.4th at 665.

### a.    Quasi-Contract and UCL Claims

The elements of a quasi-contract claim are "(1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense." *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citing *Peterson v. Cellco P'ship*, 164 Cal.

App. 4th 1583, 1593 (2008)). "The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009) (citing *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657 (1992) (emphasis in *Perry*)).

The UCL prohibits "unfair competition," which is defined as "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. An "unfair" business practice "is one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) (citation and quotation marks omitted). To state a claim under the unfair prong, a plaintiff must allege facts showing that the consumer injury is substantial, not outweighed by any countervailing consumer benefits, and could not have been reasonably avoided. *In re Sony Grant Wega KDF–E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1091 (S.D. Cal. 2010). *See also* MSJ Order at 14 (concluding that the same allegations that showed a triable issue of fact for quasi-contract also supported Plaintiffs' UCL claim).

Plaintiffs assert that this case presents the following common issues: (1) whether Pepperdine has received a benefit (Plaintiffs' tuition);[8] (2) whether Pepperdine's promise to provide in-person classes and activities that were not in fact provided would render retention of that full benefit unjust; (3) whether Pepperdine's refusal to refund prorated tuition for the lack of in-person classes and services is "unfair" under the UCL; and (4) the fact and measure of damages/restitution. *See* Class Cert. Mot. at 8–9.

Pepperdine argues that common issues do not predominate in either the quasi-contract restitution claim or the UCL claim. Pepperdine asserts that multiple individualized

---

[8] The Court has already stated that "[t]here is no question that Pepperdine has received a benefit (Plaintiffs' tuition)." MSJ Order at 13.

inquiries go into determining whether Pepperdine's retention of students' tuition and fees was unjust or unfair, such as: what statements each member was exposed to that led to his or her expectation of in-person learning, how much each member subjectively values an in-person versus online education, and the cost to Pepperdine to educate each student. To support its argument, Pepperdine cites to cases in which courts have denied class certification of unjust enrichment claims. *See, e.g.*, *Little v. Grand Canyon Univ.*, No. CV-20-00795-PHX-SMB, 2022 WL 266726 (D. Ariz. Jan. 28, 2022) (certifying fee class for breach of contract claim, but denying certification for unjust enrichment claims as "inherently unsuitable for class certification."). But the Ninth Circuit has not broadly held that UCL restitution claims are unfit for class certification. In fact, federal courts applying California law routinely certify these types of claims. *See, e.g.*, *Pulaski & Middleman*, 802 F.3d at 985 (reversing denial of certification of UCL class, because there was no need to make individual determinations regarding entitlement to restitution).

The Court is not persuaded that students' differing understanding of where any promise for in-person education came from is dispositive. Plaintiffs all share the common claim that they signed up for an in-person education, paid for an in-person education, and yet only received an in-person education for half of the Spring 2020 semester. That is not changed by the fact that different members of the class would have been exposed to different advertisements and materials. Pepperdine's argument that individual issues predominate because certain students might have used on-campus resources more than other students—and that those students therefore subjectively valued in-person education more—is similarly unavailing. Commonality and predominance are not eliminated just because every single class member would not have utilized Pepperdine's campus in the exact same way in Spring 2020. While one student may utilize the university campus and campus services in a different way than one of her peers, both students would have paid the same tuition at the same fixed price. *See Ninivaggi v. Univ. of Delaware*, No. 20-CV-1478-SB, 2023 WL 2734343, *9 (D. Del. Mar. 31, 2023) ("And though students may make

more or less (or better or worse) use of [campus services], that does not change their fair market value."). Accordingly, for these reasons and those that follow, Plaintiffs' claims are appropriate for class-wide treatment.

### 3. Typicality

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id*. Typicality is a "permissive standard" and requires only that the representative's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Plaintiffs were both Pepperdine students in Spring 2020 whose in-person classes were cancelled in March 2020 and who were barred from campus for the rest of the semester. They are therefore typical of the Proposed Class. Pepperdine nonetheless argues that typicality is not met because Plaintiffs relied on statements concerning the "specific programs and classes *in which they enrolled*[,]" meaning that they necessarily relied on different statements than class members who were enrolled in other programs. *See* Class Cert. Opp. at 20 (emphasis in original). As described *supra*, while it is true that Plaintiffs and absent members of the class were exposed to different materials and publications based on their specific schools or programs, that fact is not dispositive. Plaintiffs, just like the rest of the class, enrolled in and paid for in-person classes for the entire Spring 2020 semester but only received an in-person education for part of the semester. The fact that

-20-

Plaintiffs and every member of the class did not enroll in the exact same courses does not eliminate typicality because their alleged injury is the same.

Pepperdine also argues that Rezvani is atypical because he chose to remain remote for the Fall 2020 semester even though he had the option to return to campus. Rezvani chose to remain remote because of his personal health concerns about COVID. This does not make him atypical—throughout the pandemic, every person has had to engage in their own individualized calculus regarding their health conditions and willingness to expose themselves to COVID. Plaintiff Rezvani was no different. Further, Rezvani's decisions about the Fall 2020 semester have no bearing on the typicality of his claim for a tuition refund for the Spring 2020 semester. Rezvani paid the same tuition and was subject to the same policies as the rest of the Proposed Class.

### 4. Adequacy

The Rule 23(a)(4) adequacy determination turns on the answers to two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Similarly, Rule 23(g) requires courts to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P 23(g)(1)(A).

Pepperdine does not argue that Plaintiffs or their counsel are inadequate, nor did they when Plaintiffs first requested that Hagens Berman Sobol Shapiro LLP and Shegerian & Associates, Inc. be appointed as Interim Co-Lead Counsel for Plaintiffs. This Court has previously concluded that proposed Class Counsel meet the requirements of Rule 23(g), and it reaches the same conclusion here. *See* Order Appointing Interim Class Counsel [Doc. # 65.]

**C.    Superiority**

The factors the Court considers in determining superiority of the class action device are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).    When "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"    *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). But the Ninth Circuit has made clear that in general, district courts in this circuit "should not refuse to certify a class merely on the basis of manageability concerns."    *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017).

Pepperdine did not challenge superiority in its opposition brief, so the Court considers this issue to be uncontested.    Even if that were not so, given the common issues in this case and the fact that Plaintiffs' claims have already been consolidated in this action, the Court concludes that Plaintiffs' claims are well-suited to class treatment.

**V.**

**CONCLUSION**

In light of the foregoing, the Court **DENIES** Pepperdine's motion to exclude Dr. Singer and **GRANTS** Plaintiffs' motion to certify a class as to their quasi-contract restitution and UCL claims.

The Court certifies the following Class:

**All students who paid or were obligated to pay tuition, fees, or other costs to Pepperdine for the Spring 2020 academic term.**

The Court appoints Plaintiffs as Class Representatives and appoints Hagens Berman Sobol Shapiro LLP and Shegerian & Associates, Inc. as Class Counsel.

**IT IS SO ORDERED.**

DATED:  September 26, 2023

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE