Michael A. Tompkins, Esq.*
**Leeds Brown Law, P.C.**
One Old Country Road, Suite 347
Carle Place, NY 11514
Telephone: (516) 873-9550
mtompkins@leedsbrownlaw.com
*Admitted Pro Hac Vice*

*Co-Counsel for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUY NGUYEN, individually on behalf of himself and other individuals similarly situated,<br><br>          Plaintiff,<br><br>          vs.<br><br><br>STEPHENS INSTITUTE, d/b/a ACADEMY OF ART UNIVERSITY,<br>          Defendant. | Case No. 20-cv-04195-JSW<br>**NOTICE OF SUPPLEMENTAL AUTHORITY** |

Plaintiff hereby provides this notice of supplemental authority of one recent decision in a similar COVID-19 tuition and fee refund action, *In Re University of Southern California Tuition and Fees Covid-19 Refund Litigation,* Case No. 2:20-cv-04066 (C.D. Cal. Sept. 29, 2023) (Dkt. 213) a copy of which is attached hereto.

Plaintiff respectfully submits that this decision further supports his position in this matter in support of Plaintiff's Motion for Class Certification (Dkt. 59) and Article III Standing in response to the Order to Show Cause (Dkt. 66).

Dated: Executed this 26th Day of Sept. 2023.

      Carle Place, New York

**LEEDS BROWN LAW, P.C.**
Michael A. Tompkins, Esq. (admitted Pro Hac Vice)
One Old Country Road, Suite 347
Carle Place, NY 11514
Telephone: (516) 873-9550
mtompkins@leedsbrownlaw.com

*Counsel for Plaintiff and the Putative Class*

NOTICE OF SUPPLEMENTAL AUTHORITY

# Decision

*In Re University of Southern California Tuition and Fees Covid-19 Refund Litigation*, Case No. 2:20-cv-04066 (C.D. Cal. Sept. 29, 2023) (Dkt. 213)

1
2
3
4
5
6
7
8  **UNITED STATES DISTRICT COURT**
9  **CENTRAL DISTRICT OF CALIFORNIA**
10
11

12  *In re University of Southern California*    )    Case No. CV 20-4066-DMG (PVCx)
13  *Tuition and Fees COVID-19 Refund*           )
14  *Litigation*                                 )    **ORDER RE MOTION FOR CLASS**
                                                  )    **CERTIFICATION [135], MOTION TO**
15                                                )    **EXCLUDE TESTIMONY OF DR. HAL**
                                                  )    **SINGER [149], MOTION FOR**
16                                                )    **JUDGMENT ON THE PLEADINGS**
                                                  )    **[152], MOTION TO STRIKE EXPERT**
17                                                )    **REPORT OF JOHN L. HANSEN [162],**
                                                  )    **MOTION TO STRIKE EXPERT**
18                                                )    **REPORT OF DR. RONALD WILCOX**
                                                  )    **[166]**
19                                                )
20                                                )
21                                                )
22                                                )
23                                                )
24
25
26
27
28

Before the Court are (1) Plaintiffs' Motion to Certify a Class [Doc. # 135]; (2) Defendants' Motion to Exclude the Expert Testimony of Dr. Hal Singer [Doc. # 149]; (3) Defendants' Motion for Partial Judgment on the Pleadings [Doc. # 152]; (4) Plaintiffs' Motion to Strike the Expert Report of John L. Hansen [Doc. # 162]; and (5) Plaintiffs' Motion to Strike the Expert Report of Dr. Ronald Wilcox [Doc. # 166]. All five motions are fully briefed, and the Court held a hearing on the motions on June 6, 2023. Having carefully considered the parties' arguments, the Court issues the following omnibus ruling on all the pending motions.

# I.

## RELEVANT PROCEDURAL BACKGROUND

Plaintiff Christina Diaz filed this action on May 4, 2020. [Doc. # 1.] On July 17, 2020, the Court issued an order consolidating Diaz's case with others asserting similar claims. [Doc. # 54.] Plaintiffs filed their Consolidated Class Action Complaint on August 14, 2020 [Doc. # 55], and the Court issued an order dismissing certain claims on August 6, 2021. [Doc. # 99 ("MTD Order").] On May 5, 2022, with the Court's leave, Plaintiffs filed the operative First Amended Complaint ("FAC") [Doc. # 126], and Defendants filed their Answer on May 20, 2022 [Doc. # 128]. Plaintiffs are Diaz, Injune David Choi, Chile Mark Aguiniga Gomez, J. Julia Greenberg, Justin Kerendian, and Latisha Watson. Defendants are the University of Southern California ("USC") and the Board of Trustees of the University of Southern California ("the Board"). Plaintiffs assert claims for (1) breach of contract, (2) restitution based on quasi-contract, and (3) violation of California's Unfair Competition Law ("UCL") under the "unfair" prong.

Plaintiffs now seek to certify the following Class:

**All students who paid or were obligated to pay tuition, fees, or other costs to The University of Southern California for the Spring 2020 academic term.**

*See* Mot. for Class Certification at 2.[1]  Plaintiffs seek to exclude all students who enrolled in USC education programs that, prior to March 10, 2020, were offered exclusively online.[2] Plaintiffs also seek an order appointing (a) Plaintiffs as Class Representatives, and (b) Interim Co-Lead Counsel[3] as Class Counsel.

Because the parties' motions to exclude evidence and USC's motion for judgment on the pleadings all bear on the Court's resolution of Plaintiffs' motion to certify a class, the Court will resolve those motions first.

## II.

## FACTUAL BACKGROUND

USC is a private, nonprofit university located in Los Angeles, California.  Answ. ¶ 33.  In the 2019–2020 academic year, USC enrolled approximately 48,500 undergraduate and graduate students.  Answ. ¶ 5.

USC offers some fully-online graduate programs, but does not offer an online undergraduate program.  Answ. ¶ 5.  For the Spring 2020 term, full-time graduate and undergraduate students paid $28,628 in tuition.  FAC ¶ 43; Answ. ¶ 43.  All students also paid a Student Health Service Fee of $366, and a Student Programming Fee of $64 for undergraduates and $43 for graduate students.  Answ. ¶ 43.  Some students also paid other fees.  *Id.*

---

[1] Page citations herein refer to the page number inserted by the CM/ECF system.

[2] Plaintiffs also seek to exclude Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other people or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judges assigned to this action, and any member of a judge's immediate family. *Id.*

[3] The Court previously appointed Berger Montague PC, Hagens Berman Sobol Shapiro LLC, and the Katriel Law Firm as Interim Co-Lead Counsel.  *See* Order re Consolidation at 6-10 (evaluating qualifications under Federal Rule of Civil Procedure 23(g)(1)) [Doc. # 54].

-3-

The Court has already concluded that statements in USC's Student Handbook, in the 2019–20 USC Catalogue, on its website, and in promotional materials plausibly constituted a promise to provide access to campus facilities and in-person, on-campus courses. *See* MTD Order at 7–8; *see also* Pls.' Ex. 6 (Student Handbook) [Doc. # 144-7], Pls.' Ex. 7 (archive of catalogue) [Doc. # 144-8]. Although the legal effect of those statements is contested, there is no dispute that USC made them.

Plaintiffs and the Proposed Class were students at USC in March 2020, when USC switched all its scheduled in-person classes to an online modality due to the COVID-19 pandemic. *See* Pls.' Ex. 8 at 10:4–5 [Doc. # 144-9]. On March 6, 2020, in response to the spread of COVID cases in the United States, USC announced that it would conduct a three-day test of its online-learning capabilities, from March 11 to 13. Answ. ¶ 61. On March 10, 2020, after the first instance of community transmission of COVID-19 in Los Angeles was identified, USC announced that it would continue remote classes even after Spring Break, such that in-person classes would not resume until after March 29, 2020. *Id.* at ¶ 62. On March 11, 2020, the provost of USC sent a memorandum to the USC community announcing that the period of remote learning would continue until April 14, 2020, and notifying students leaving campus for Spring Break that they could not return until at least April 13, 2020. *Id.* at ¶ 63. On March 16, 2020, USC announced that the remainder of the Spring 2020 semester would be remote, and that most buildings would not be publicly accessible "until further notice." *Id.* at ¶ 65.

On March 19, 2020, the Governor of California and the Mayor of Los Angeles issued "stay-at-home" orders that required individuals to stay home or at their place of residence, with limited exceptions. Defs.' Exs. 1, 2 [Doc. ## 146-2, 146-3].[4] The next day, USC further limited campus access, telling students who had left during Spring Break that they could not return to campus to retrieve their belongings until sometime in the future; asking

---

[4] The Court **GRANTS** USC's unopposed request for judicial notice of these documents.

students with the ability to leave campus to do so, and asking those who could not to submit a request for review; and informing students that most campus buildings would be inaccessible. Answ. ¶¶ 66–67; *see also* Doc. # 144-9 at 18:8–17. USC offered a prorated refund of room and meal plan payments to students who had left university housing, but did not provide a tuition refund to any students. *Id*. at ¶¶ 71–72.

After courses moved online, USC continued to provide remote classes, and provided additional resources to students to effectuate remote learning. For example, physics students were sent at-home lab kits, and music students received microphones to record practice and send the recordings to professors. *See* Doc. # 146-14 at 5:22–6:8. Internally, USC staff and faculty members privately acknowledged that remote learning was less than ideal. *See* Pls.' Exs. 1 [Doc. # 144-2] (Office of the Provost staffer acknowledging that "it's hard to dispute the assertion that the online experience pales in comparison to the on-campus experience"); 24 [Doc. # 144-25] (law school dean acknowledging that "it is not how we would teach if we were unconstrained"); 25 [Doc. # 144-26] (adjunct professor of architecture acknowledging that online learning could not replace "real corporeal presence in tactile form and space"); 26 [Doc. # 144-27] (dance school dean acknowledging that "we know nothing can compare to in-person instruction"). Still, USC's annual survey found that students' course ratings were similar to, or higher than, previous semesters. Defs.' Ex. 6 [Doc. # 146-7]. USC conducted all its classes remotely in Fall 2020, and raised its tuition by approximately 3.5%, yet enrollment rates remained fairly steady. *See* Defs.' Ex. 14 [Doc. # 146-15].

Choi, Kerendian, Gomez, Diaz, and Greenberg were undergraduates in spring 2020. Watson was a graduate student in social work. Choi graduated in May 2020, and the other Plaintiffs graduated on time. *See* Doc. # 146-8 at 6:18–20; Doc. # 146-9 at 23:8–16; Doc. # 146-10 at 7:1–6; Doc. # 146-11 at 4:1–7; Doc. # 146-12 at 5:7–14; Doc. # 146-13 at 6:16–19. Plaintiffs had different USC experiences, and different experiences of the pandemic. For example, Diaz was studying abroad in Italy in the Spring 2020 semester. Diaz Depo. at 14:23–25, 27:16–24 [Doc. # 146-9]. Before studying abroad, she signed a

form that released USC of liability for injury caused by, for example, "public health risk." *Id*. at 22:20–23. After COVID-19 began to spread in Italy, USC flew Diaz and other students to Spain, but Diaz left the country shortly thereafter, before USC was forced to end the program entirely. *Id*. at 28:17–21, 30:3–6. Gomez, on the other hand, was less concerned about COVID-19, and would have been willing to go to in-person classes. Gomez Depo. at 8:12–9:3 [Doc. # 146-10]. Plaintiffs, and proposed class members more generally, all paid for their education in different ways. One of Choi's regrets after COVID-19 forced the closure of the school was that he could not attend sporting events. Choi Depo. at 8:3–5 [Doc. # 146-8].

## A. Report of John L. Hansen

John L. Hansen is a Certified Public Accountant who holds a B.S. in Commerce from Santa Clara University. He was hired by USC to provide an opinion about whether students were damaged by the shift to online learning. Hansen Report ¶ 1 [Doc. ## 146-6 (redacted), 156-1 (under seal)]. Hansen's report concludes that students were not harmed by the shift to online learning. He notes that, although USC did not offer a remote undergraduate option before Spring 2020, USC did offer remote graduate programs, and USC charged the same amount per credit for online and in-person units. *See id*. at ¶¶ 29–32. USC charges a variety of fees to students depending on services the students choose. For example, USC charges a fee to off-campus residents, and separate fees to students who elect to live on-campus, apart from rent. *Id*. at ¶ 34. Hansen says that many of these fees, such as the New Student Fee (which "supports various Welcome Week activities") and Norman H. Topping Fee (which supports scholarships), are not tied to in-person services. *Id*. at ¶ 35. He acknowledges that other fees may be tied to in-person services. *See id*. at ¶ 36 (citing, *e.g.*, the Student Health Service Fee and the Student Programming Fee). But he says that students received the benefits of those fees even after the shift to remote learning—or received a refund of those fees. *See id*. at ¶¶ 37–40 (citing refunds for housing, meal, and parking fees, and noting that the student health center remained open

and began offering online services); *see also id*. at ¶ 68 (noting USC recorded a loss of approximately $19 million for housing and meal plan refunds).

Hansen also opines that the Plaintiffs' progress toward their degrees was not harmed by the shift to remote learning. Each Plaintiff earned the units for which they were registered, and achieved GPAs "similar to or higher than their overall weighted average GPA." Hansen Report ¶ 44; *see also id*. at Table 4. He describes testimony from USC administrators and Plaintiffs emphasizing the importance of keeping students on pace toward their degrees, and notes that graduation rates remained stable in 2020 as compared to the three previous and two following years. *Id*. at ¶¶ 45–47, Table 3. He notes that evidence shows that job placements and starting salaries post-graduation for students were not impacted by the transition to online learning that semester, and that Plaintiffs believe their USC educations helped their careers. *Id*. at ¶¶ 49–51.

Hansen questions the assumption that online learning is necessarily worth less than in-person learning. He cites to a 2019 survey performed by Quality Matters and Eduventures Research that found that 85% of responding universities charged the same or more for online education than in-person education. Hansen Report ¶ 42. He also notes that some students may have preferred the safety of online classes in Spring 2020. *Id*. at ¶ 43. As noted above, USC raised tuition in the Fall 2020 semester by approximately 3.5%. *Id*. at ¶¶ 52–53. Retention of freshman students from spring 2020 to fall 2020 was approximately 91%, as compared with 96% or 97% in the two years before and two years after. *Id*. at Table 6, ¶ 54. Hansen says the retention rate indicates that degree progress was more important to most students than modality of instruction. *Id*. at ¶ 54. And, as already noted, course evaluation rates were also about the same for Spring 2020 as for Spring 2019. *Id*. at ¶¶ 57–58.

Hansen also notes that USC students do not pay for the full cost of instruction through tuition. Hansen Report ¶ 59. For the fiscal year ending in June 2020, USC reported tuition and fees of approximately $1.6 billion and expenses for instruction of approximately $2.5 billion. *Id*. at ¶ 62. Tuition is set based on tuition levels at peer institutions, the cost

of delivering education, the impact of tuition increases, the historical tuition charged, and inflation. *Id*. at ¶¶ 60–61. Hansen says that students' willingness to pay is not a factor. *Id*. at ¶ 63. He opines that, because USC is highly selective—its undergraduate acceptance rate is approximately 15%—USC could charge significantly more than it does. *Id*. at ¶ 63. Accordingly, Hansen says that, because students are not charged the full cost of their education, it is speculative to conclude that students would be entitled to a tuition refund *even if* the value of an online education were less than in-person education. *Id*. at ¶ 64.

Moreover, Hansen opines that USC did not benefit financially from COVID-19. USC experienced "relatively immaterial" cost savings from the pandemic in Spring 2020, and recorded a loss of $97.3 million relating to academic operating activities. Hansen Report ¶¶ 66–67, 69. That loss measures both reductions in revenue and increases in expenses caused by the pandemic. *Id*. at ¶ 67; *see also id*. at ¶¶ 68–70 (detailing categories of loss and new expenses); *but see* Pls.' Ex. 29 [Doc. # 144-30] (showing USC's assets increased by more than $1 billion from fiscal year 2020 to 2021).

In the 2019-2020 school year, USC enrolled approximately 45,600 students, across 23 schools in more than 100 undergraduate majors and minors. Hansen Report ¶ 74. Some schools offered online degree programs, while other did not. *Id*. at ¶ 75. Hansen notes that students studying business at the Marshall School of Business likely felt the impact of the transition to remote learning differently than did undergraduate students studying biology. *Id*. at ¶ 76. He opines that, because each student would place a different value on particular aspects of their educational experience, it would be impossible to determine the harm of a shift to remote learning on a class-wide basis. *Id*. at ¶¶ 78, 89–90 (noting that Plaintiffs provided many different reasons why they decided to attend USC). Similarly, each student would value campus activities, like clubs and organizations, and campus facilities, like libraries and the student health center, differently. *Id*. at ¶¶ 79–81, 83–84. Hansen also notes that some of these programs continued through online offerings even after the switch to remote learning. *Id*. at ¶¶ 82, 84–87. Plaintiffs themselves used these facilities differently, and took advantage of remote offerings in disparate ways. *See, e.g.*, *id*. at ¶ 86

(identifying disparate use of career counseling services). Students—including Plaintiffs—paid for tuition from different sources, including through loans, scholarships, and payments by their parents. *Id*. at ¶¶ 91–93.

Finally, financial aid applies differently to each student at USC. The school's admission process is need blind. Nearly two-thirds of USC undergraduates receive some form of financial aid. Hansen Report ¶ 98. To determine the financial aid amounts, the university calculates each student's expected family contribution, then seeks to make up the shortfall between that amount and the cost of attendance with funds from federal, state, and university sources. *Id*. at ¶¶ 99–100. The average grant or scholarship amount for undergraduates in the Spring 2020 semester was approximately $19,950 per student. *Id*. at ¶ 100. Approximately 26% of all undergraduates receive federal student loans during the same period, with an average loan amount of $6,323 per student. *Id*. Hansen opines that, to the extent a student's expected family contribution would not have changed even if the cost of attendance were lower (due to a pandemic-related reduction in tuition and fees), the student "would not necessarily have been damaged in this case. *Id*. at ¶ 102.

## B.  Report of Dr. Hal Singer[5]

Plaintiffs' expert witness, Dr. Hal Singer, holds a Ph.D. in economics from Johns Hopkins University and currently serves as an economist at Econ One Research and as an adjunct professor at the University of Utah. *See* Singer Report ¶ 13 [Doc. ## 149-3, 158-1 (under seal)]; *see also id*. at Appendix 1 (*curriculum vitae*). In his expert report, he describes his efforts to assess the difference in value between an "On-campus Experience" at USC—*i.e.*, "a university education provided through in-person classes and accompanied

---

[5] The Court recently denied a motion to exclude Dr. Singer in another COVID-19 tuition refund case. *See In re Pepperdine University Tuition and Fees COVID-19 Refund Litigation*, No. CV-20-4928-DMG (KSx) (C.D. Cal. Sept. 26, 2023). Dr. Singer's professional background and the methodology of his surveys are the same here as they were in the *Pepperdine* case. Rather than incorporating by reference the factual background regarding Dr. Singer's report as set forth in its prior order, however, the Court repeats much of the background here because the student populations and the survey results themselves were different, and Pepperdine and USC challenged Dr. Singer's report on different bases.

by access to a university campus, where students participate in on-campus experiences and use physical campus facilities and resources in person," *see* Singer Report ¶ 6—and an "Online Experience" at USC—*i.e.*, "a university education provided exclusively through online classes, videoconferencing, an online learning management system, and . . . not accompanied by access to in-person campus events, resources, or the use of physical campus facilities." *Id.* He designed and conducted a Choice-Based Conjoint ("CBC") analysis to determine the fair market value of each. Based on his analysis, Dr. Singer concluded that an Online Experience has a fair market value that is 30.4% less than an On-Campus Experience for undergraduates, and 24.1% less for graduate students. *Id.* at ¶ 7. Subtracting the fair market value of the Online Experience from the amount actually paid (allegedly for the On-Campus Experience), he calculates total damages to the class of $76.31 million. *Id.*

Dr. Singer explains that CBC analysis is commonly used by economists to isolate the value of individual product features. Singer Report ¶¶ 8, 18–22. Other scholars have used CBC analysis specifically in the context of assessment of college students' willingness to pay for online learning. *Id.* at ¶ 23 n.33. The factors considered in Dr. Singer's analysis are similar to those included in the academic papers he discusses that seek to evaluate similar questions. *See id.* at ¶ 27.

Dr. Singer's survey first processed respondents through a "Screener" module to identify respondents similar to potential USC graduate or undergraduate students. The undergraduate student module selected for individuals who had not recently taken a survey regarding online education; reside in the United States; have taken within the past five years, or plan to take within the next two years, undergraduate, in-person, on-campus courses at a college or university; are between the ages of 18 and 30; and have an unweighted high school GPA and standardized test scores consistent with USC's undergraduate admissions criteria. Singer Report ¶ 32. The graduate student module selected for individuals who had not recently taken a survey regarding online education; reside in the United States; have enrolled within the past five years, or plan to enroll within

-10-

the next two years, in an in-person, on-campus graduate program at a college or university; are over the age of 18; and have an unweighted undergraduate GPA and standardized test scores consistent with USC's graduate admissions criteria. *Id.* at ¶ 33.

The survey then informed respondents that the survey concerned USC, and described the "attributes" of the programs they would be asked to choose between. These included a "Class Modality" attribute (*i.e.*, in-person or online), a "Campus Facilities Access" attribute, a "Tutoring Services" attribute, a "Career Services and Events" attribute, and a "Semester Cost" attribute. Singer Report ¶¶ 36–38. The "Class Modality" attribute was designed to be neutral, so as not to imply that online or in-person classes were superior. *See id.* at ¶¶ 36, 42. The tutoring and career services attributes were decoys, to prevent respondents from discerning the purpose of the survey. *Id.* at ¶ 37. The "Semester Cost" attribute allowed Dr. Singer to empirically assign a dollar value to the utility each respondent placed on a particular attribute. Respondents were asked to assume that they would receive the same financial aid as they actually received, or expected to receive, in real life. Respondents were also told the cost did not include room and board. *Id.* at ¶¶ 38, 43. The "Semester Cost" values used real USC tuition as the "Base Price," then allowed students to choose up to 150% of the base price or down to 50% of the base price. *Id.* at ¶¶ 43–44. Each combination of options included a "no buy" option—that is, students could choose not to attend, rather than attend any of the three combinations the survey proposed. *Id.* at ¶ 47.

Dr. Singer engaged an established survey platform to provide sample respondents. Singer Report ¶ 48. Before fielding the survey, he did a "soft-launch" to a small number of respondents, to ascertain how long the survey would take, if respondents were confused, and to identify any issues. *Id.* at ¶ 49. He ultimately fielded the survey to approximately 500 respondents each for the undergraduate and graduate surveys. *Id.* at ¶ 48. Dr. Singer notes that it is established in the economic literature that survey respondents often make choices that appear to be irrational, and that this does not necessarily undermine the

-11-

surveys' results. He did not remove apparently irrational responses from the sample. Singer Report ¶ 50(a).[6]

Once the survey results are received, Dr. Singer analyzes them to assign a dollar value to each particular attribute for each respondent. Singer Report ¶¶ 54–55, 59–60. His analysis shows that undergraduate and graduate students are "highly sensitive" to shifting from the On-Campus Experience to an Online Experience. *Id.* at ¶ 55.

Finally, Dr. Singer concludes that the shift in the fair market value is exactly equal to the tuition discount required to make students whole because he assumes—pursuant to what he describes as the "traditional CBC approach"—that the supply curve is fixed. Singer Report ¶ 66. After determining the fair market value of an Online Experience, Dr. Singer calculates class damages by comparing the decline in value experienced by proposed class members with the net tuition and fees actually paid by Proposed Class Members. *Id.* at ¶¶ 67, 70. Dr. Singer explains that he assumes the supply curve is fixed because USC, after allegedly committing to in-person instruction, "cannot rewind the clock and attempt to renegotiate that promise in a but-for world with only a smaller subset of Plaintiffs after realizing the lower net Tuition and Fee price it would need to offer to make them purchase its Online Experience voluntarily." *Id.* at ¶ 73. Dr. Singer opines that it would be unlikely that USC would reduce enrollment in response to any potential reduction in students' willingness to pay the existing tuition. *Id.* at ¶ 74. This is because, Dr. Singer explains, the incentive structures of university tuition pricing exist outside normal market forces: universities often seek to maximize the number of prestige-enhancing students enrolled, rather than seeking to maximize tuition. In addition, USC likely faced fixed costs and made enrollment decisions on a longer-term basis than the single semester at issue here. *Id.* at ¶¶ 77, 80.

---

[6] There appear to be two paragraph 50s in the Singer Report. This citation is to the first of them, which the Court designates as paragraph 50(a).

## C.     Report of Dr. Ronald Wilcox

Dr. Ronald Wilcox is the NewMarket Corporation Professor of Business Administration at Darden Graduate School of Business Administration at the University of Virginia.  Wilcox Report ¶ 1 [Doc. ## 146-17, 156-9 (under seal)].  He has substantial experience with conjoint analysis, including authoring papers using conjoint analysis.  *Id*. at ¶ 2.  USC retained him to provide his opinion on Dr. Singer's analysis.  *Id*. at ¶ 11.

Dr. Wilcox concludes that Dr. Singer's analysis is flawed because it fails to account for the reality of how the market for higher education works.  Wilcox Report ¶ 17.  First, he says, Dr. Singer fails to consider how schools compete against each other, and how students choose a school.  *Id*. at ¶ 18.  Second, he argues that Dr. Singer fails to account for financial aid packages and the reality that other individuals, such as students' parents, often bear a substantial portion of the tuition price.  *Id*. at ¶ 19.  Third, he contends that Dr. Singer fails to account for how USC sets its tuition price.  *Id*. at ¶ 20.  Fourth, he says that Dr. Singer's analysis is unreliable "because it ignores the true preferences of approximately 72 percent of his respondents."  *Id*. at ¶ 21.  He also identifies a number of potential flaws with Dr. Singer's survey design.  *See id*. at ¶¶ 24–28.  The Court discusses Dr. Wilcox's criticisms in greater detail with respect to USC's motion to exclude Dr. Singer's report, *infra*.

### III.

### USC'S MOTION FOR JUDGMENT ON THE PLEADINGS

USC seeks judgment on the pleadings as to Plaintiffs' breach of contract claim because performance of the contract between the parties was impossible.  [Doc. ## 152 (MJP), 179 (Opp.), 188 (Reply).][7]

---

[7] The parties and the Court assume, for purposes of USC's MJP, that there was an implied-in-fact contract between USC and Plaintiffs that required USC to provide Plaintiffs with an in-person education. *See* MJP at 5.

-13-

**A. Legal Standard**

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is properly granted only when, taking all the factual allegations in the complaint as true, "the moving party is entitled to judgment as a matter of law." *Fairbanks N. Star Borough v. U.S. Army Corps. of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008) (quoting *Dunlap v. Credit Protection Ass'n, L.P.*, 419 F.3d 1011, 1012 n. 1 (9th Cir. 2005) (*per curiam*)). A court must construe the factual allegations in the pleadings in the light most favorable to the non-moving party, but as in a Rule 12(b)(6) motion, it need not accept as true conclusory allegations that are contradicted by matters properly subject to judicial notice or by exhibits incorporated into the complaint by reference. *See Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citing *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004)); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "Generally, district courts have been unwilling to grant a Rule 12(c) dismissal unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984) (citation and internal quotation marks omitted).

**B. Discussion**

Plaintiffs concede that it was impossible for USC to continue to hold in-person classes in light of government stay-at-home orders. *See* Opp. at 5. California Civil Code section 1511(1) excuses performance of a contractual obligation if performance is rendered impossible "by the operation of law." *Accord Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766, 772 (9th Cir. 1986) (under California law, "no liability exists for breach of a contract whose performance has been made impossible by operation of law") (citing section 1511(1)). USC's performance therefore was excused as a matter of law. *Accord In re Pepperdine Univ. Tuition & Fees COVID-19 Refund Litig.*, --- F. Supp. 3d ----, 2023 WL 2576766, at *6 (C.D. Cal. 2023) (granting motion for summary judgment on breach of implied contract claim but leaving restitution claim intact); *Arredondo v. Univ. of La Verne*,

-14-

618 F. Supp. 3d 937, 947 (C.D. Cal. 2022) (granting summary judgment on breach of implied-in-fact contract claim, but converting that claim into a quasi-contract claim for restitution).

Despite conceding that USC's performance was impossible, Plaintiffs ask the Court to deny USC's MJP and allow their breach of contract claim to go forward as a separate claim. USC acknowledges that recovery is still available when a contract fails due to impossibility, but argues that the only available recovery is restitution, not damages. MJP at 5; Reply at 11–13; *see also* Restatement (Second) of Contracts § 272 (1981) (in cases governed by the rules on impracticability and frustration of purpose, "either party may have a claim for relief including restitution. . . ."). Plaintiffs, on the other hand, seek to salvage their breach of contract claim primarily because they wish to pursue a remedy more akin to a contract remedy than a quasi-contract remedy.[8]

Section 371 of the Second Restatement of Contracts provides that restitution may be measured "by either (a) the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or (b) the extent to which the other party's property has been increased in value or his other interests advanced." Restatement (Second) of Contracts § 371 (1981); *accord id*. at § 377 cmt. b (in assessing the restitution due where performance is excused because of impossibility, "[u]sually the measure of reasonable value is appropriate"). California law also provides that if performance is excused for some reason other than an act of the creditor, "the debtor is entitled to a ratable proportion of the consideration to which he would have been entitled upon full performance, according to the benefit which the creditor

_____

[8] Although Plaintiffs' briefs describe the remedy they seek as damages, at the hearing, they conceded that it would more properly be characterized as restitution. *See, e.g.*, *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004) (restitution may be awarded "in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason").

-15-

receives from the actual performance." Cal. Civ. Code § 1514.[9] It appears, then, that the difference between the price paid and "benefit" or "reasonable value" received is the proper measure of recovery. Indeed, this principle is well-established in California cases. For example, in *City of Vernon v. City of Los Angeles*, 45 Cal. 2d 710 (1955), the California Supreme Court upheld the trial court's conclusion that, where the City of Los Angeles' performance on a contract had been rendered impossible, the City of Vernon should pay only the "fair value" of the services received from Los Angeles. 45 Cal. 2d at 721.

The parties disagree, however, regarding how to evaluate "fair value" or "reasonable value" when an otherwise enforceable contract has been rendered unenforceable due to impossibility. USC contends the proper measure is the fair *market* value, taking into consideration all the market factors that might influence how much a product could be worth. Plaintiffs, on the other hand, argue the proper measure is the fair value *to the plaintiff* of what he or she bargained for, without accounting for other factors that might be important to the market. Plaintiffs cite to Section 1514, *City of Vernon*, and *Ogren v. Inner Harbor Land Co.*, 83 Cal. App. 197 (1927), for the idea that "fair value" should be measured as contract damages would have been measured—in terms of the value to the plaintiff, without regard to market forces. *See, e.g.*, *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 531 (2022), *review denied* (Dec. 14, 2022) (where a contract has been breached, damages are intended to provide the plaintiff with "the benefit of the

---

[9] USC argues that section 1514 is inapplicable to this action, but cites to no principled reason why the Court should follow section 1511 and not section 1514. *See* Reply at 10. While USC correctly notes that no court appears to have applied section 1514 in a similar case, and only one court (in an unpublished disposition) has relied on the statute since 1977, there is no basis in the either statutory language or the case law interpreting it to restrict its meaning as USC requests. The statute's language does not indicate that it applies *only* to payment for performance before impossibility arose. Moreover, courts have not applied it thus. In *Akins v. Riverbank Canning Co.*, 80 Cal. App. 2d 868 (1947), the California Court of Appeal held that the principle of section 1514 supported the trial court's conclusion that impossibility arising after a contract was made would not excuse the defendant from making partial performance to the plaintiff even after complete performance was impossible. 80 Cal. App. 2d at 873. The Court therefore concludes that it would be improper to disregard the statute.

bargain that full performance would have brought"). But Plaintiffs' authority is thin. The main support for their theory is the references to "damages" in *Ogren*. *See, e.g.*, *Ogren*, 83 Cal. App. at 200 (citing approvingly to a Massachusetts Supreme Court case holding that a purchaser of real property that was subsequently condemned could elect to rescind or "to take what the vendor could convey and hold the latter answerable in damages for the balance"); *City of Vernon*, 45 Cal. 2d at 721 (citing *Ogren* for the idea that a contract was not "abrogated" by its failure due to impossibility). *Ogren* and *City of Vernon* remain good law, and the contrary authorities cited by USC primarily concern restitution under the UCL, and therefore are not precisely on point. At the same time, it is not at all clear that the *Ogren* court's reference to "damages" means that Plaintiffs would be entitled to expectation damages, rather than restitution, on this claim.

Ultimately, the Court need not resolve the question of whether restitution on a failed contract should be measured by reference to fair market value or value to the plaintiffs. As discussed in further detail below, in the context of the claims for quasi-contract and violation of the UCL, Plaintiffs have proposed a plausible method of measuring the fair market value of a USC education. For this and other reasons that the Court need not address, Plaintiffs' separate restitution claim based on breach of an implied-in-fact contract is superfluous.

## C.    Conclusion

Accordingly, the Court **GRANTS** USC's MJP. USC's impossibility defense bars Plaintiffs' breach of contract claim for damages.

## IV.

## EXPERT REPORT OF DR. HAL SINGER

USC moves to exclude the testimony of Plaintiffs' expert, Dr. Hal Singer, pursuant to Federal Rules of Evidence Rule 702 and 403. [Doc. ## 149 (motion), 175 (opposition), 189 (reply).]

-17-

## A. Legal Standard

Under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny, a court must

> assess [an expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof . . . . Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013) (internal quotations and citations omitted). In evaluating expert testimony, "the trial court is 'a gatekeeper, not a fact finder.'" *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). "The judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" *Id.* at 1044 (quoting *Alaska Rent-A-Car*, 738 F.3d at 969). It is permissible to raise *Daubert* motions at the class certification stage. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.7 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc., On Behalf of Itself & All Others Similarly Situated*, 143 S. Ct. 424 (2022).

## B. Discussion

Under Federal Rule of Evidence 702, a qualified expert witness may offer opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts

of the case." USC does not challenge Dr. Singer's qualifications, only his opinions, and the Court finds that Dr. Singer is qualified.

### 1. CBC Analysis

USC objects that Dr. Singer's use of a conjoint survey to measure the value of different modalities of higher education is a "red flag," because it was developed expressly for purposes of testifying in this and other COVID-19 education cases. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.").

In response, Dr. Singer cites to other economists' use of conjoint surveys to measure the value of different modalities of higher education. *See* Singer Report ¶¶ 23–27; *see also id.* at 23 n.33. And Plaintiffs provide additional authority for this method in their Opposition. *See* Opp. at 13 n.10 (citing Esteban M. Aucejo et al., *Estimating Students' Valuation for College Experiences*, 224 J. Pub. Econ. 104926 (2023)). The Court therefore concludes that use of a conjoint survey to determine willingness-to-pay for higher education is within the realm of what is accepted in the academic literature. The fact that Dr. Singer himself had not previously used conjoint surveys for evaluating the value of certain attributes of an education also does not warrant exclusion. *See, e.g.*, *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017) (noting that prior publication is one indicator that expert testimony is based on valid scientific principles, but concluding that "the district court was wrong to put so much weight on the fact that the experts' opinions were not developed independently of litigation and had not been published"). Because the Court concludes that a conjoint analysis is a reasonable method for measuring value in the higher education context, the Court declines to exclude his opinions on this basis.

USC also notes that the two analyses discussed in Dr. Singer's report surveyed current students at a particular university about their willingness to pay. Dr. Singer

surveyed anonymous respondents, not current (or former) USC students.  Although this difference may render Dr. Singer's results less persuasive than the results in those studies, this is a basis for USC to attack his results on cross-examination, not for the Court to exclude them.  *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015) ("Courts regularly find that concerns that a survey's sample size is . . . . unrepresentative do not preclude its admission, but go to the weight to be accorded the survey results.").

### 2.  Survey Design and Results

USC also challenges the survey design and results.

#### a.  Supply-Side Factors

In particular, USC argues that Dr. Singer's analysis is unreliable under Rule 702 and irrelevant under both Rule 702 and *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), because he failed to account for USC's willingness to sell an online-only USC education for the amount that Dr. Singer concludes students would be willing to pay.  Therefore, USC contends Dr. Singer's analysis cannot prove class-wide damages because he has not established the "fair market value" of the difference between an online-only and an in-person USC education.

California courts and federal courts applying California law frequently exclude, as unreliable or as insufficiently probative of class-wide damages, conjoint analyses that consider only a consumer's willingness to pay and not the market value of a fungible consumer product.  For example, in *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd on other grounds sub nom. Schell v. Volkswagen AG*, No. 20-17480, 2022 WL 187841 (9th Cir. Jan. 20, 2022), another district court in California excluded plaintiffs' conjoint analysis of the market value of a Volkswagen car marketed as environmentally friendly, but that secretly contained a "defeat device" that allowed the car to cheat on federal and state emissions tests.  500 F. Supp. 3d at 943, 949.  Plaintiffs' expert produced a conjoint analysis designed to determine how much less consumers would have been willing to pay for the car, had they known it contained a defeat device.  *Id*. at 949.  But the court concluded the conjoint was unreliable,

-20-

and excluded it. The court provided several reasons for excluding the conjoint, including the vagueness of certain survey questions that may have substantially impacted the results, failure to perform a pretest, and some "facially nonsensical" results, like a consumer's valuation of a $2,000 navigation system in a $16,000 car at $9,000. *Id.* at 949–50. Most important here, though, the court concluded that the expert's report was unreliable because "presuming that Defendants would have sold the same number of cars, at the exact price that consumers would have been willing to pay, is not a way to reliably incorporate supply-side considerations." *Id.* at 949.

In *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019), another district court applying California law excluded an expert's conjoint analysis as insufficiently probative of class-wide damages because the analysis failed to consider whether a car manufacturer would have sold as many cars if the manufacturer had been required to sell those cars at a substantially lower price. 407 F. Supp. 3d at 240. *See also Zakaria*, 755 F. App'x at 625 (plaintiff's damages expert was insufficiently probative of class-wide damages because the expert considered only consumers' willingness to pay higher prices, and not how the product's actual market price had changed without the inaccurate label); *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) (expert's damages model was unreliable because it failed to consider the defendant's willingness to sell a prescription drug for the lower price proposed by the expert); *but see MacDougall v. Am. Honda Motor Co.*, No. 20-56060, 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021) (unpublished) (reversing exclusion of expert witness under *Daubert* because the absence of market considerations went "to the weight given the survey, not its admissibility").

Despite USC's objections, the Court concludes that Dr. Singer's analysis is neither junk science nor insufficiently probative or reliable to be put before a jury. It is useful to understand *why* other courts have excluded experts for failure to consider the supply side. As another district judge in California has explained,

if consumer willingness to pay changed because of the revelations about the products—which is what the conjoint analysis seeks to measure—then the supply-side of the equation would change too. A company facing a loss in sales might, for example, lower its prices so that a large enough group of consumers would purchase the products. Or a company might cut back on supply.

*Maldonado v. Apple, Inc*., No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *21 (N.D. Cal. May 14, 2021). Dr. Singer likewise explains that, in the context of a "traditional short-term profit-maximizing firm," a firm might reduce its supply in response to a decline in demand to (a) avoid incurring the costs of producing the product, or (b) drive prices back up. Singer Report ¶ 74. But he also explains why he believes that this response was unlikely in USC's case. First, he says, college and universities maximize profits differently than other sellers. Second, they operate under a fixed-cost or quasi-fixed-cost pricing model. Third, in this context, supply decisions are usually not made on a single-semester basis. *Id*. at ¶¶ 74–80.[10]

USC criticizes Dr. Singer's analysis for failure to consider potential supply-side factors, but it does not argue that similar supply-side concerns are truly at issue here. Instead, USC says that it simply was not willing to sell its services for less than the tuition it set at the beginning of the school year. This logic finds no support in the case law. Instead, other courts' requirement that plaintiffs account for supply-side considerations is aimed at the need to prove a reasonable value for the product they actually received, so that courts can measure the difference between the price paid and the value received. In this case, Dr. Singer's rationale for declining to consider supply-side factors in his analysis is not unreasonable. In fact, USC's own expert, Dr. Wilcox, criticizes Dr. Singer for

---

[10] Despite this reasoning, Dr. Singer did also perform an analysis in which he imagines that USC had reduced supply in response to students' lower willingness to pay. *See id*. at ¶¶ 81–86. USC concedes that it never considered reducing enrollment. The Court therefore does not discuss this analysis.

-22-

attempting to consider USC's tuition-setting in the context of market forces *at all*. Dr. Wilcox argues that, because USC is an exclusive, non-profit research institution, its tuition prices are not set at the "market clearing level." Wilcox Report ¶ 66. Instead, USC's admissions and tuition-setting decisions are based on other factors, including generating high quality research, promoting student welfare, increasing academic standards, and enhancing the University's prestige. *Id*. Factors such as the tuition set by other universities, potential future price increases, and actual costs of operation also factor into tuition setting. *Id*. at ¶ 68. In fact, unlike with other consumer goods, consumers—*i.e.*, students—do not just choose USC, USC chooses its students. Moreover, USC receives applications from many more qualified applicants than it admits each year. Thus, Dr. Wilcox argues, even if the students who were enrolled in spring 2020 had decided they were no longer willing to pay full price, USC could simply have replaced those students with other qualified students who would. *Id*. at ¶ 67; *see also* Hansen Report ¶¶ 55–64 (explaining that USC's tuition is not set based on market rates, and in fact does not even cover the cost of instruction); *but see* Singer Report ¶ 77 (noting that universities often seek to maximize the number of prestige-enhancing students enrolled, rather than seeking to maximize tuition).

Due to the unusual nature of the "product" USC offers, USC's argument is, essentially, that the fair market value of a USC education is whatever USC decides to charge. Although a jury may find this argument persuasive, it is not a basis to prevent Plaintiffs from attempting to prove fair market value on a different theory. Given USC's own evidence that tuition is essentially unmoored from ordinary market forces, the Court concludes that Dr. Singer's decision to consider only students' willingness to pay, and not other, unidentified supply-side forces, does not justify exclusion of his opinion. The reality that USC actually raised tuition in Fall 2020 for an all-online semester, and still saw very little attrition from Fall 2019 to Fall 2020, does not compel a different conclusion. Nor does the fact that USC has long charged the same tuition for in-person and online courses,

-23-

when a school offers both.[11]   A reasonable factfinder may very well find this real-world evidence of the value of an online-only USC education more persuasive than Dr. Singer's analysis.  But this contrary evidence is not a basis to exclude Dr. Singer's opinions.

### b. Rule 403

USC also argues that Dr. Singer's testimony should be excluded as irrelevant on various bases.  *See* Wilcox Report ¶ 22 ("Benefits associated with protection from COVID-19 would very likely affect students' WTP [willingness-to-pay] for USC's remote education in Spring 2020, but Dr. Singer's conjoint survey fails to mention it.").  The Court disagrees that Dr. Singer's decision to ignore COVID-19 renders his opinion inadmissible.  When calculating restitution under the UCL, "the focus is on the value of the service at the time of purchase."  *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).  Although the prevalence of COVID-19 might very well be a factor that a factfinder considers in evaluating the merits of this case, failure to control for COVID-19 risk in determining the fair market value of a USC education does not render his opinion irrelevant.[12]

Likewise, Dr. Singer's survey design—which asks only about full semesters in person or online, and not about the half-and-half circumstance that occurred in spring 2020—does not render his opinion irrelevant.  *See* Wilcox Report. ¶ 87 (criticizing Dr. Singer for failing to conduct survey about half-semester online because "the fact that the

---

[11] This is not necessarily dispositive, because before the pandemic, USC did not offer an online undergraduate program. Answ. ¶ 5.  It would therefore be impossible to entirely compare apples to apples with respect to USC's real-world pricing decisions. *See, e.g.*, *Omori v. Brandeis University*, ---- F. Supp. 3d. ----, 2023 WL 3511341, at *6 (D. Mass. May 17, 2023) (rejecting the plaintiffs' proposed damages model based on differences between the cost Brandeis charged for online courses or in-person courses for comparing apples to oranges by comparing the online courses offered in one program to the in-person courses offered in another).

[12] As discussed with respect to Dr. Wilcox's report, *infra*, although the idea that COVID safety would probably have impacted the survey results has surface appeal, there is no actual evidence in the record that this is true.  In any event, this too is a proper subject for cross-examination rather than exclusion.

-24-

first half of Spring 2020 was available in person meant that students would have had a chance to make in-person connections with course instructors, fellow classmates, and broader faculty and staff."). USC's other criticisms of Dr. Singer's model—the fact that Dr. Singer failed to model USC's financial aid; Dr. Singer failed to conduct a pretest; Dr. Singer's failure to provide an error rate—are likewise bases for cross-examination at trial, not exclusion.

USC also highlights several of Dr. Wilcox's critiques of Dr. Singer's opinion. Dr. Wilcox opines that Dr. Singer's results were "absurd" because 60% of respondents chose USC over the "no buy" option, even though fewer than 12% of eligible U.S. undergraduate students apply to USC. Wilcox Report ¶ 38 [Doc. # 158-2 (under seal)]. Dr. Wilcox also analyzed Dr. Singer's raw data and concludes that respondents placed an absurdly high value on the two "decoy" factors, tutoring and career services: 43% of respondents valued tutoring at over 50% of USC's gross tuition and fees amount, and 45% of respondents valued career services at over 50% of gross tuition and fees. *Id*. at ¶ 57.[13] Finally, Dr. Wilcox analyzed Dr. Singer's raw data and finds that over 72% of survey respondents' "true preferences" fall outside the range of tuition prices to which Dr. Singer limits his analysis. *Id*. at ¶ 69. Dr. Wilcox concludes that, if Dr. Singer's study accurately reflected USC students' willingness to pay, enrollment should have fallen by 9% for graduate students between Fall 2019 and Fall 2020, and by 20% for undergraduates. *Id*. at ¶ 58. In reality, the reenrollment rate for undergraduates was approximately 91%. *Id*. at ¶ 58 n.86. Dr. Wilcox's critiques are certainly an appropriate basis for USC to attack Dr. Singer's analysis on cross-examination. The Court disagrees, however, that this is a proper basis to exclude his opinion.

---

[13] Dr. Wilcox cites only "my workpapers" as the basis for these conclusions. *See id*. at ¶ 57 n.83, n.84. Moreover, while USC's *Daubert* motion assigns dollar values to these conclusions, those dollar values are not contained in Dr. Wilcox's report. Nevertheless, Plaintiffs do not object to these issues, and the Court therefore accepts Dr. Wilcox's conclusions as contained in his report.

## C. *Boston University* Case

USC also argues that Dr. Singer's opinions should be excluded because another Court recently excluded Dr. Singer's damages opinion in a different COVID refund case. In *In re Bos. Univ. COVID-19 Refund Litig.*, No. CV 20-10827-RGS, 2023 WL 2838379, at *1 (D. Mass. Apr. 7, 2023), another federal district court excluded Dr. Singer's opinions because he improperly aggregated the plaintiffs' distinct theories of breach of contract—failure to provide in-person classes, for which the plaintiffs paid tuition, and failure to provide access to campus, for which the plaintiffs paid fees—into a single theory of failure to provide an on-campus experience. *See* 2023 WL 2838379, at *2 ("the contractual obligation to provide in-person instruction allegedly arose from a different source (and allegedly was accepted by payment of a different price) than the contractual obligation to provide access to on-campus facilities").

But Plaintiffs' theory here does not distinguish between tuition and fees or classes and access to campus, and USC does not seek Dr. Singer's exclusion on this basis. Instead, USC cites to *dicta* in the *Boston University* decision in which the court noted its concerns about whether a CBC analysis could properly compare the value of an in-person and an online-only education. *See* 2023 WL 2838379, at *3 ("CBC Analysis is not normally used to compare consumer valuations of wholly differentiated product choices, say a new car as opposed to a mountain bike."). That conclusion was not the basis, however, for the *Boston University* court's exclusion of Dr. Singer's analysis. Moreover, as discussed above, this Court is persuaded by Plaintiffs' and Dr. Singer's citations to other academics who have used conjoint analysis to model the value of in-person education that Dr. Singer's choice was reasonable. To the extent that the *Boston University* court concluded otherwise, this Court respectfully disagrees that Dr. Singer's report should be excluded on this basis.

## D. Conclusion

In light of the foregoing discussion, USC's motion to exclude Dr. Singer's testimony is **DENIED**.

-26-

# V.

## EXPERT REPORT OF JOHN L. HANSEN

Plaintiffs move to strike the expert report of John L. Hansen pursuant to Federal Rule of Evidence 702. [Doc. ## 162 (Mot.), 182 (Opp.) 191 (Reply).]

### A.  Legal Standard

The Court has already stated the legal standard for a motion to exclude an expert witness, *supra*, and incorporates it herein.

### B.  Discussion

Plaintiffs do not challenge Hansen's qualifications, but contend that *Comcast v. Behrend*, 569 U.S. 27 (2013), requires the Court to strike Hansen's report. Plaintiffs also argue that Hansen's opinions are unreliable and irrelevant, and should be stricken on that basis as well.

#### 1.  *Comcast* Fit

In *Comcast*, the United States Supreme Court reversed certification of an antitrust class action because the plaintiffs' proposed expert had created a damages model that failed to properly isolate the only viable theory of antitrust injury remaining in the case. *See* 569 U.S. at 37. The district court had concluded that only one of the plaintiffs' four theories of antitrust injury was capable of class-wide proof. *Id*. at 31. Yet, the damages model proposed by the plaintiffs' expert incorporated damages caused by *all four* theories. *Id*. at 31–32. The district court nevertheless certified a class. *Id*. at 32. The Supreme Court reversed, because the proposed damages analysis must be tied to the plaintiffs' actual theory of the case. *Id*. at 38.

Plaintiffs rely on *Comcast* to argue that Hansen's report must be excluded because it is inconsistent with USC's theory of the case—insofar as it purports to resolve the damages question on a class-wide basis. But Plaintiffs equate USC's factual defense of the case (i.e., that there was no injury to students from the shift to remote learning) with USC's legal argument that Plaintiffs' claims are not capable of resolution on a class-wide basis. *Comcast* does not require exclusion of Hansen's report on this basis.

### 2. Rule 702

Plaintiffs also argue that Hansen's report should be excluded as unreliable, on various bases. None are persuasive.

First, Plaintiffs contend that Hansen's report should be excluded because he did not identify "direct" evidence of the potential difference in value of an online and an in-person education, and only identified "indirect" evidence. But the "indirect" evidence to which Plaintiffs object is Hansen's uncontroverted evidence that USC charged the same amount for in-person and online-only graduate programs before the pandemic. *See* Hansen Report ¶ 30. Plaintiffs correctly note that USC did not offer an online option for undergraduate students before the pandemic, and that all the Proposed Class Members in graduate programs for which an online version was available had elected to enroll in the in-person option instead. While these facts may make Hansen's opinion less persuasive to a fact-finder, they do not render it unreliable or irrelevant.

Next, Plaintiffs argue that Hansen's opinions are not truly expert opinions, but merely "parrot" USC's documents. To some extent, Hansen's report does consolidate evidence and make arguments based on that evidence, rather than provide analysis or opinion that requires forensic accounting expertise. It is generally true that it is "inappropriate for experts to become a vehicle for factual narrative." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013). But this is a Rule 403 *in limine* issue for trial—to the extent the Court does not find Hansen's report helpful for resolving issues relating to class certification, the Court will not rely on the report.

Plaintiffs also argue that Hansen's remaining opinions regarding why students were not impacted by the shift to online learning are irrelevant. Plaintiffs say that the fact that students' progression toward a degree, GPAs, and post-graduate employment figures were largely unaffected is irrelevant, because Plaintiffs seek relief only for not obtaining the mode of instruction for which they bargained. Moreover, Plaintiffs contend Hansen's reliance on the consistency in students' GPAs is unreliable because he failed to account for USC's reformulation of its grading system, allowing for additional pass/fail grading,

during that semester. *See* Hansen Depo. at 81:9–84:12 [Doc. # 163-2]. But these are merits questions, and are not a basis for excluding Hansen's report at this stage.

Finally, Plaintiffs seek to strike Hansen's report because he devotes a number of paragraphs to his conclusion that USC did not benefit financially from switching to online education. This, Plaintiffs contend, applied the wrong legal standard, because neither Plaintiffs nor USC argues that the expense to USC of switching to online education is relevant to any of the parties' claims. Thus, Plaintiffs seek exclusion of Hansen's entire report. But that is no basis for excluding the portions of the report that describe his conclusion that Plaintiffs and the Proposed Class did not suffer any injury, which applies the correct legal standard. To the extent Plaintiffs seek to strike the portion of Hansen's report regarding USC's financial benefit, Plaintiffs' request is premature, and would be better raised when it is clearer which issues remain to be resolved at trial.

## C. Conclusion

Accordingly, the Court **DENIES** Plaintiffs' motion to strike Hansen's opinions.

# VI.

# MOTION TO EXCLUDE REPORT OF DR. RONALD WILCOX

Plaintiffs also seek to strike Dr. Wilcox's report. [Doc. ## 166, 183 (Mot.), 174 (Opp.), 190 (Reply).]

## A. Legal Standard

The Court has already stated the legal standard for a motion to exclude an expert witness, *supra*, and it applies with equal force to this motion.

## B. Discussion

### 1. Failure to Conduct Survey

Plaintiffs argue that Dr. Wilcox's report is unhelpful, and therefore inadmissible, because he did not undertake his own survey. Plaintiffs point out that Dr. Wilcox did not analyze how Dr. Singer's analysis might have changed, had he implemented Dr. Wilcox's

critiques.  Therefore, Plaintiffs argue, Dr. Wilcox's analysis is unhelpful, because it does not actually *prove* that there are any flaws in Dr. Singer's analysis.

Plaintiffs' critique is not entirely off-base:  Dr. Wilcox's analysis might be more persuasive if he actually showed that his criticisms would have changed the outcomes of Dr. Singer's analysis.  *See, e.g.*, note 13, *supra* (noting that Dr. Wilcox's analysis provides insufficient basis to find Dr. Singer's report unreliable).  But under the circumstances, the Court does not find that Dr. Wilcox's report is wholly unhelpful.  In the context of a conjoint analysis, a specialized form of survey that must be conducted in accordance with specific parameters, Dr. Wilcox helps point out potential problems with Dr. Singer's survey.  Dr. Wilcox also helps explain the possible limitations of a conjoint analysis in these circumstances.  Although it is true that Dr. Wilcox does not offer an alternative damages model, and therefore would leave a jury to speculate as to how much to award in damages if it accepts his critiques, USC has no burden to prove what Plaintiffs' damages should be.

Nor do Plaintiffs' cited cases require Dr. Wilcox's exclusion.  Indeed, even the district courts in those cases, primarily involving Lanham Act claims, did not actually exclude experts on the basis that they failed to offer their own survey results.  *See Whirlpool Properties, Inc. v. LG Elecs. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006) (plaintiffs' expert's failure to conduct her own survey on likelihood of confusion in a Lanham act case rendered her critique of the defendants' expert's survey less persuasive); *Wreal LLC v. Amazon.com, Inc.*, No. 14-21385-CIV, 2015 WL 12550932, at *16 (S.D. Fla. Feb. 3, 2015), *report and recommendation adopted*, No. 14-21385-CIV, 2015 WL 12550912 (S.D. Fla. Aug. 31, 2015), *aff'd on other grounds*, 840 F.3d 1244 (11th Cir. 2016) (giving little weight to expert opinion that merely offered a critique of the defendant's likelihood of confusion survey in resolving a motion for a preliminary injunction in a Lanham Act case); *Combe Inc. v. Dr. Aug. Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 464 (E.D. Va. 2019), *aff'd*, 851 F. App'x 357 (4th Cir. 2021) (where defendant failed to conduct its own survey, no empirical basis to disregard

the plaintiff's survey in Lanham Act case); *Teaching Co. P'ship v. Unapix Ent., Inc.*, 87 F. Supp. 2d 567, 584 (E.D. Va. 2000) (after court trial, giving less weight to expert critique of the plaintiff's likelihood of confusion study because the critiquing expert did not conduct a new survey); *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1076 (E.D. Cal.), *aff'd*, 348 F. App'x 288 (9th Cir. 2009) (noting the defendant's failure to conduct a competing survey in resolving motion for preliminary injunction in Lanham Act case).

Plaintiffs do cite one case in which a district court excluded an expert for failure to conduct his own survey. In *Dunne v. Res. Converting, LLC*, No. 4:16 CV 1351 DDN, 2022 WL 2132449 (E.D. Mo. June 14, 2022), the court granted a motion to exclude an expert, in part because the expert's criticisms of another expert were "unsupported and unhelpful to a jury." 2022 WL 2132449, at *17. The court reached this conclusion, however, because the expert's *factual basis* for the criticism was unsupported. The expert criticized the other side's expert for failure to "account for the increased drying rate that would occur if the samples were mechanically agitated." *Id*. But there was in fact no indication that there would be an increased drying rate if the samples were mechanically agitated. *Id*. In other words, the issue was not the expert's failure to conduct his own survey, it was his failure to explain the factual basis for his critique. Here, by contrast, Plaintiffs do not object to any specific factual infirmities in Dr. Wilcox's report. Their objection is procedural, not substantive.

## C. Incorrect Legal Standard

Plaintiffs also contend that Dr. Wilcox's report is unhelpful because he applied the incorrect damages standard, focusing on the "supply-side" factors that the Court has concluded are not critical in this case. Although the Court agrees that these criticisms are not dispositive as to the admissibility of Dr. *Singer's* report at this stage in the case, it is unclear whether they may be relevant later in the case. The Court therefore declines to strike Dr. Wilcox's report on that basis at this time. While failure to apply the proper legal standard may be a proper basis for precluding an expert from testifying to a jury, *see Lanard Toys Ltd. v. Anker Play Prod., LLC*, No. CV 19-4350-RSWL-AFMX, 2020 WL

6873647, at *6 (C.D. Cal. Nov. 12, 2020) (granting motion *in limine* to exclude expert for failure to apply the correct legal standard), it would be premature at this stage to decide whether Dr. Wilcox's opinion should be so excluded.

**D.    Conclusion**

Plaintiffs' motion to strike Dr. Wilcox's report is therefore **DENIED**.

## VII.

## MOTION FOR CLASS CERTIFICATION

Plaintiffs now seek to certify the following Class:

**All students who paid or were obligated to pay tuition, fees, or other costs to The University of Southern California for the Spring 2020 academic term.**

*See* Mot. for Class Certification [Doc. ## 135 (motion), 144 (MPAA)].   USC filed an Opposition [Doc. # 157], and Plaintiffs filed a Reply [Doc. # 186].

**A.    Legal Standard**

Federal Rule of Civil Procedure 23 provides the standard for certification of a class action.  Plaintiffs must meet all of the requirements under Rule 23(a) and must also satisfy at least one of Rule 23(b)'s requirements.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Courts refer to the Rule 23(a) requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation."  *See Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).   If the four prerequisites of Rule 23(a) are satisfied, a court must also find that the plaintiffs can "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  At issue here is whether Plaintiffs can prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a pleading standard, and it requires the party seeking class certification to "affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation omitted). Thus, a court must conduct a "rigorous" class certification analysis. *Id.* at 350-51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). Frequently the analysis "will entail some overlap with the merits of the plaintiff's underlying claim," and "sometimes it may be necessary for the court to probe behind the pleadings . . . ." *Id.* at 351 (internal quotation omitted). The Supreme Court cautions, however, that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). A plaintiff seeking certification of a class must prove by a preponderance of the evidence that the prerequisites of Rule 23 are satisfied. *Olean*, 31 F.4th at 665.

Here, the Court will address numerosity, then commonality and predominance together, and then will turn to adequacy, typicality, and superiority.

**B. Discussion**

**1. Numerosity**

The proposed class contains more than 40,000 class members. *See* Answ. ¶ 5. There is no dispute that numerosity is satisfied.

**2. Commonality and Predominance**

Because the commonality and predominance factors go hand in hand, the Court will consider them together. The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tele. of S.W. v. Falcon*, 457 U.S. 147, 157(1982)). In determining that a common question of law exists, it is insufficient to find that all putative class members have suffered a violation of the same provision of law. *See id.* at 350.

-33-

Rather, the putative class members' claims "must depend upon a common contention" that is "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *See id.*

Once Plaintiffs have established that common questions exist, they must show that those common questions will predominate over individualized issues. The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal citations and quotations omitted). This requires "careful scrutiny" of "whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues." *Id.* (internal citations and quotations omitted). If "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *See Olean*, 31 F.4th at 665.

### a. Quasi-Contract Claim

The elements of a quasi-contract claim are "(1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense." *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citing *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008)). "The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009) (citing *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657 (1992) (emphasis in *Perry*)). Plaintiffs argue that they can establish the elements of this claim using class-wide evidence.

### i. Class-Wide Proof of Injustice

USC argues that determining whether USC's retention of students' tuition and fees was "unjust" will require individualized determinations. That may sometimes be true. The Eleventh Circuit, for example, has held that "common questions will rarely, if ever, predominate an unjust enrichment claim." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009). This is because, under Florida law, treatment of the equitable claim of unjust enrichment requires examination of "the particular circumstances of an individual case" before the Court can "assure itself that, without a remedy, inequity would result or persist." *Id.*; *accord Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824 JWS, 2015 WL 1292444, at *14 (D. Ariz. Mar. 23, 2015) (denying certification of unjust enrichment class brought under Arizona law because "[t]he individualized nature of th[e] 'fairness' inquiry renders class certification inappropriate").

The Ninth Circuit has not made such a broad pronouncement, however, and federal courts applying California law routinely certify UCL restitution claims. *See, e.g.*, *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) (reversing denial of certification of UCL class, because there was no need to make individual determinations regarding entitlement to restitution). Still, in *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017), the court affirmed denial of class certification on an unjust enrichment claim arising out of a "damage waiver" that customers could purchase when renting tools from Home Depot. 471 F.3d at 1066. The plaintiff alleged that Home Depot improperly failed to inform customers that the waiver was optional. *Id.* Home Depot presented evidence, on the other hand, that sales associates sometimes told customers the waiver was optional; signs posted in stores sometimes said the same; and the language of the final sales contract did the same. The court considered salient the fact that Home Depot had five different versions of the sales contract during the proposed class period. *Id.* The court ultimately affirmed denial of class certification because the question of whether it was "unfair" for Home Depot to retain the purchase price for the waiver

depended on whether Home Depot had told the customer the waiver was optional, which necessarily rested on individualized issues. *Id.* at 1070. Other district courts have reached similar conclusions, applying California law. *See, e.g.*, *Oddo v. Arcoaire Air Conditioning & Heating*, No. ED CV 15-01985-CAS (Ex), 2019 WL 1460627, at *12 (C.D. Cal. Mar. 22, 2019) (denying certification of unjust enrichment claim by defective HVAC system owners because unfairness of the defendant's retention of benefit would turn on individualized issues, including whether the owner would have been exposed to a disclosure of the defect if made, whether the system had actually failed, and whether they had obtained repairs from the defendant after any failure) (citing *Berger*, 741 F.3d at 1070). But these cases do not foreclose the possibility of certification for *all* unjust enrichment claims. Instead, they make clear that, as with all Rule 23 motion, a rigorous and case-specific analysis is required.

USC argues that Plaintiffs' quasi-contract claim requires assessment of individualized issues such as whether the proposed class member actually saw any of the alleged promises of an in-person education; what that student understood about those promises; how much the student cared about in-person versus online education; whether the student was on campus or abroad for the semester; students' tolerance of COVID-19 risk; the support each student received after the transition to online learning; and how the student's tuition and fees were paid.

The Court has already concluded that a reasonable factfinder could determine that USC's statements in its Student Handbook, Catalogue, and marketing materials constituted a promise to provide an in-person education. *See* MTD Order at 6–9. There is no dispute that these materials were the same and were available in the same form to each student. But USC argues that proposed class members did not all see all of them, or find a promise of in-person instruction in the same place. *See, e.g.*, Diaz Depo. at 11:23–12:11 (stating that course syallabi promised in-person instruction), Watson Depo. at 12:1–15:2 (identifying USC website and syllabi), Gomez Depo. at 12:10–13:21 (brochures and campus tours). Thus, according to USC, whether proposed class members actually saw

-36-

those representations is an individualized issue.  But the only case USC cites for this proposition, *Weisberg v. Takeda Pharms. U.S.A., Inc.*, No. CV 18-784 PA (JCX), 2018 WL 4043171 (C.D. Cal. Aug. 21, 2018), rested on very different facts.  In that case, another district court declined to certify the implied contract claims of a proposed nationwide class of prescription drug buyers because the defendant had actually published multiple versions of the brochure at issue in the plaintiff's claims, and so the plaintiff failed to establish identical contract terms across all class members.  2018 WL 404317, at *10.  That is not the case here.  Moreover, USC's course of conduct can create a promise to provide in-person classes.  *See, e.g.*, *Requa v. Regents of Univ. of California*, 213 Cal. App. 4th 213, 228 (2012) (promise to provide health coverage after retirement implied from course of conduct and statements contained in "various benefit booklets and handbooks published by [the defendant's] authorized representative").  Moreover, USC cites to no authority for the proposition that an individual who accepts an offer to be bound must read each term of the contract for the agreement to be effective.  Indeed, courts routinely hold the opposite. *See, e.g.*, *Dinan v. SanDisk LLC*, No. 18-CV-05420-BLF, 2020 WL 364277, at *12 (N.D. Cal. Jan. 22, 2020), *aff'd*, 844 F. App'x 978 (9th Cir. 2021) ("Failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract.") (citations omitted); *Kliff v. Hewlett Packard Co.*, 318 F. App'x 472, 475 (9th Cir. 2008) (rejecting contention that employee was not bound by at-will employment provision because he did not read it).  According to the same principle, it is not critical that Class Members have read each alleged promise to provide in-person classes, as long as the promise was made.  For this reason, the Court is not persuaded that students' differing understanding of where any promise for in-person education came from is dispositive.[14]

---

[14] Although USC raises this argument in the context of Plaintiffs' now-defunct breach of contract claim, the Court considers the existence of a promise to provide in-person education relevant to whether it would be "unjust" for USC to retain proposed class members' tuition.  Thus, whether USC actually made such a promise remains a live issue and a common question.

USC also suggests that the Catalogue's reservation of rights renders class treatment inappropriate. *See* Opp. at 20. But this argument is unpersuasive—indeed, the existence of a reservation of rights that might bar the entire Class' claims *supports* certification. *See, e.g.*, *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 167 (2d Cir. 1987) (a common defense supports class treatment because "[i]f the defense succeeds, the entire litigation is disposed of"). Moreover, the Court already rejected USC's argument that the reservation of rights precludes a contract here. *See* MTD Order at 10.

USC's arguments that certain students might have used on-campus resources more than other students, and even that certain students (like Diaz) were not on campus at all, are unavailing. A number of other courts have resolved similar questions in COVID-19 tuition refund cases. But each of those cases involved different facts and arguments. *See, e.g.*, *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338–41 (7th Cir. 2023) (reversing and remanding certification order for failure to perform the "rigorous analysis" required for class certification, by relying only on the pleadings and declining to engage with the university defendant's arguments regarding predominance); *Arredondo v. University of La Verne*, 341 F.R.D. 47 (C.D. Cal. 2022) (certifying a class of undergraduates at University of La Verne's Main/Central campus who paid tuition or mandatory fees during the Spring 2020 term); *Garcia De Leon v. New York Univ.*, No. 21 CIV 05005 (CM), 2022 WL 2237452 (S.D.N.Y. June 22, 2022) (denying motion to certify class of all NYU students who had paid fees during the Spring 2020 term because (1) students enrolled in different schools across NYU paid different types of fees, and individual schools or programs refunded certain fees, (2) some students might not even have attempted to avail themselves of the services for which they paid fees, and thus discerning harm to class members would require making a fact-specific determination about each one, and (3) the plaintiff and her counsel were inadequate); *Little v. Grand Canyon Univ.*, No. CV-20-00795-PHX-SMB, 2022 WL 266726 (D. Ariz. Jan. 28, 2022) (certifying fee class for breach of contract claim, but denying certification for unjust enrichment claims as "inherently unsuitable for class certification," but without identifying which individualized issues would predominate); *In*

*re Suffolk Univ. Covid Refund Litig.*, No. CV 20-10985-WGY, 2022 WL 6819485 (D. Mass. Oct. 11, 2022) (denying certification because educational malpractice doctrine would bar damages, but finding that common issues would predominate over individualized ones as to liability for breach of an implied contract and for unjust enrichment, and rejecting argument that individualized issues as to which program students enrolled in or financial aid defeated predominance); *Evans v. Brigham Young Univ.*, No. 1:20-CV-100-TS, 2022 WL 596862, at *4 (D. Utah Feb. 28, 2022), *aff'd*, No. 22-4050, 2023 WL 3262012 (10th Cir. May 5, 2023) (denying certification of class of "all people" who paid tuition at BYU because the class was neither ascertainable nor administratively feasible); *Omori*, ---- F. Supp. 3d. ----, 2023 WL 3511341 (denying certification for failure to identify a damages model that could prove class-wide damages).

The Court finds the decision in *Ninivaggi v. Univ. of Delaware*, No. 20-CV-1478-SB, 2023 WL 2734343 (D. Del. Mar. 31, 2023), most persuasive. In *Ninivaggi*, the court evaluated a proposed class of undergraduate students who paid tuition during the Spring 2020 term. 2023 WL 2734343, at *1. The court ultimately certified a class as to both plaintiffs' breach of contract and unjust enrichment claims. *Id*. at *7. The court concluded that the question of whether an implied-in-fact contract term promised in-person education was capable of resolution on a class-wide basis, because "[t]he conduct necessary to show that in-person education was part of the bargain will be the same for all class members." *Id*. The court rejected the university's argument that "minor" questions, such as whether a particular student saw a given alleged promise on the university's website, "would . . . move the needle." *Id*. The court also reasoned that the university's affirmative defense of impossibility was capable of resolution on a class-wide basis. *Id*.

But the court also granted certification on the plaintiffs' unjust enrichment claim. In *Ninivaggi*, the plaintiffs' unjust enrichment claim would be available only if there was a promise of in-person classes, but that promise was deemed unenforceable due to impossibility. 2023 WL 2734343, at *8. The court rejected the university's argument that

-39-

calculating the value of the services it provided—as would be necessary to determine restitution—would require individualized proof. *Id.* at *9. The court reasoned that:

> The fair market value of an online education does not vary by student. [The university] protests that some students got better grades in spring 2020 than any other semester. But that does not change the value of the education they received. Just as the fair market value of an in-person education does not differ depending on whether an individual student got straight As or straight Cs, so too with the value of an online education. Nor does it vary by how many clubs the student joins, how often the student uses the career services office, or how many times the student ends up in the university health center. These services are available to all students for the same fixed price. And though students may make more or less (or better or worse) use of them, that does not change their fair market value.

*Id.* Although the court recognized that calculating fair market value would be difficult, the court ascribed that difficulty to the nature of the claim, "not the presence of thousands of plaintiffs." *Id.* Accordingly, the court granted the motion to certify a class.

The same reasoning holds true here. Plaintiffs' claim is that they did not get what they were promised—an in-person education. As in *Ninivaggi*, all the members of the Proposed Class paid for an in-person education for the same fixed price. A factfinder may very well find that it is unfair to award the Proposed Class damages because USC made such substantial efforts to ensure continuity in their education, or because switching to remote learning allowed them to avoid COVID-19 exposure. But these are defenses applicable to the class as a whole, and therefore Plaintiffs' claims are nevertheless appropriate for class-wide treatment.

### ii. Class-Wide Injury

USC also contends that Plaintiffs cannot prove a class-wide injury, because Dr. Singer failed to properly measure the market value of an online-only education at USC during COVID-19. For the reasons already discussed above, the Court rejects USC's

-40-

argument that Dr. Singer failed to show the availability of restitution on a class-wide basis because he did not account for USC's unwillingness to lower its prices. As discussed above, Dr. Singer's model, which purports to establish the difference between the fair value of an online vs. in-person education, is a plausible method for showing the availability of restitution on a class-wide basis. The Court does not find Dr. Wilcox's critique of that model significantly undermines it for purposes of class certification, in part because Dr. Wilcox has not demonstrated how the results might actually have been different had Dr. Wilcox's critiques been incorporated. Although a factfinder may conclude that Dr. Singer's measure of damages is excessive, or may find Dr. Wilcox's critique persuasive and reject Dr. Singer's model, resolving these questions is not the Court's task at this stage. *Accord Olean*, 31 F.4th at 676 (the district court's task is to determine whether a damages model is "capable of showing class-wide [damages], not to reach a conclusion on the merits" of the parties' claims). Accordingly, the Court concludes that the availability of restitution is a common question and that individualized issues do not predominate.

### b. UCL Claim

The UCL prohibits "unfair competition," which is defined as "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. An "unfair" business practice "is one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) (citation and quotation marks omitted). To state a claim under the unfair prong, a plaintiff must allege facts showing that the consumer injury is substantial, not outweighed by any countervailing consumer benefits, and could not have been reasonably avoided. *In re Sony Grant Wega KDF–E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1091 (S.D. Cal. 2010). *See also* MTD Order at 15 (concluding that same allegations that stated a claim for quasi-contract also supported Plaintiffs' UCL claim).

In addition to the common questions Plaintiffs have identified as to the restitution claim, they also assert that whether USC's refusal to refund prorated tuition for the lack of

in-person classes and services is "unfair" under the UCL is a common question. For the same reasons the Court concludes the quasi-contract claim should be certified, the Court also concludes that unfairness under the UCL is a common question capable of class-wide resolution, and that individualized issues will not predominate.

### 3. Typicality

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id*. Typicality is a "permissive standard" and requires only that the representative's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Plaintiffs were all USC students in Spring 2020 whose in-person classes were cancelled in March 2020 and who were barred from campus for the rest of the semester. They are therefore typical of the Proposed Class. USC argues, however, that Diaz and Gomez are atypical because (1) Diaz was studying abroad, and was therefore atypical of on-campus students, and (2) Gomez's high COVID-19 risk tolerance means he believes USC should have continued in-person classes. But neither of these facts makes Diaz and Gomez's claims atypical. Indeed, there is no question that each USC student, and each person in the United States, experienced the spring of 2020 in a different way. That does

not make their claim for a *tuition refund* atypical of the rest of the class.  They paid the same tuition and were subject to the same policies as the rest of the Proposed Class.[15]

### 4.  Adequacy

The Rule 23(a)(4) adequacy determination turns on the answers to two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Similarly, Rule 23(g) requires courts to consider:  "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P 23(g)(1)(A).

USC does not argue that Plaintiffs or their counsel are inadequate.  Indeed, this Court has previously concluded that proposed Class Counsel meet the requirements of Rule 23(g)(1)(A).  *See* Order re Consolidation at 8–10 [Doc. # 54].  The Court reaches the same conclusion here.

### 5.  Superiority

The factors the Court considers in determining superiority of the class action device are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C)

---

[15] Nor does the fact that a few students, such as students who were studying abroad, might have individualized affirmative defenses (such as the release at issue in Diaz's case) defeat predominance. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Olean*, 31 F.4th at 668.

the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). When "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). But the Ninth Circuit has made clear that in general, district courts in this circuit "should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017).

Again, USC concedes superiority. Given the common issues in this case and the extent to which similar claims have already been consolidated in this action, the Court concludes that Plaintiffs' claims are well-suited to class treatment.

## VIII.
## CONCLUSION

In light of the foregoing, the Court:

1.    **GRANTS** USC's motion for judgment on the pleadings as to Plaintiffs' breach of contract claim;

2.    **DENIES** USC's motion to exclude Dr. Singer;

3.    **DENIES** Plaintiffs' motion to exclude Hansen;

4.    **DENIES** Plaintiffs' motion to exclude Dr. Wilcox; and

5.    **GRANTS** Plaintiffs' motion to certify a class as to their quasi-contract and UCL claims, and certifies the following Class:

> **All students who paid or were obligated to pay tuition, fees, or other costs to The University of Southern California for the Spring 2020 academic term.**

The Court appoints Plaintiffs as Class Representatives, and appoints Berger Montague PC, Hagens Berman Sobol Shapiro LLC, and the Katriel Law Firm as Class Counsel.

**IT IS SO ORDERED.**

DATED:  September 29, 2023

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

-45-